ATTORNEY FOR APPELLANT
Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana



FILED

Sep 17 2013, 12:10 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 20S05-1301-CR-10

KEVIN M. CLARK,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Elkhart Superior Court, No. 20D03-1002-FA-00007
The Honorable George W. Biddlecome, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 20A05-1202-CR-62

**September 17, 2013**

**David, Justice.**

When two police officers encountered three men in a self-storage facility and ordered them to the ground, the men were protected by the Fourth Amendment to the United States Constitution. When those protections were violated, the evidence obtained as a result was tainted and should have been suppressed at a subsequent trial of one of the men. Because that

evidence was instead admitted after the violation of the man's federal constitutional rights, we must now reverse his conviction and remand.

**Facts and Procedural History**

Robert Dunlap owned a self-storage facility in Elkhart County, Indiana. He began to suspect that a renter of one of his twenty-four-hour climate-controlled storage units, Dennis Collins, was living in his storage unit in violation of the rental agreement. On the evening of August 25, 2009, Dunlap confronted Collins about his suspicions, but Collins denied living in the unit. Later that same night, Dunlap returned to the storage facility and noticed several cars parked behind the climate-controlled building. He then called the police to request assistance in helping him remove Collins from the facility.

Sergeant Michael McHenry of the Elkhart County Sheriff's Department responded to Dunlap's call shortly after midnight the morning of August 26. Sergeant McHenry requested another officer to assist and was joined a few minutes later by Officer Dustin Lundgren. The two officers and Dunlap entered the storage building and encountered three individuals outside Collins's storage unit—Collins, James Eller, and Kevin Clark. Clark was carrying a black bag that he then dropped to the ground.

The officers ordered Collins, Eller, and Clark to sit on the ground and identify themselves. They then began to question Clark about the contents of the black bag, and specifically whether it contained any narcotics or contraband. Clark eventually admitted that there was marijuana in the bag, and Sergeant McHenry opened the bag and searched it. The search revealed a butane lighter, clear plastic baggies, pill bottles, methamphetamine, pseudoephedrine pills, and a digital scale. The presence of these items led Sergeant McHenry to believe that Clark was dealing in a controlled substance.

The officers continued questioning Clark, during which Clark told them that his car was on the property. Sergeant McHenry located the vehicle backed up behind the storage building; as he approached he noted that the windows were down and the interior of the car smelled like burnt marijuana. He searched the interior of the vehicle and then opened the trunk with Clark's keys, concerned that there might be an active meth lab inside. Upon opening the trunk he immediately smelled ammonia—a common smell around methamphetamine manufacturing—and found a large tool box. He removed the toolbox from the trunk, opened it, and found what he believed was inactive equipment for manufacturing methamphetamine. He then returned the toolbox to the trunk and closed the trunk lid.

Sergeant McHenry then went to his patrol car and got his K9 partner Falco, a certified narcotics detection dog. Sergeant McHenry returned to Clark's car and walked Falco around it. The K9 alerted to the exterior of the car and Sergeant McHenry found a half-burned marijuana cigarette on the top of the trunk, where the window met the trunk lid, that the officers had missed in their initial search. At that point Sergeant McHenry stopped his search, drafted a search warrant for authorization to search Clark's car, and contacted the Indiana State Police for assistance investigating and clearing the meth lab. Officer Lundgren then took Clark into custody and transported him to jail.

Clark was not read his Miranda[1] rights until Officer Lundgren did so while driving him to jail. He did not consent to the search of the black bag. Officer Lundgren asked Clark to consent to the search of his vehicle after the trunk had already been opened, the meth lab discovered in the closed toolbox, and the contents of the trunk replaced. Clark refused.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

The State charged Clark with Dealing in Methamphetamine as a class B felony,[2] Possession or Sale of Drug Precursors as a class D felony,[3] and Possession of Marijuana as a class A misdemeanor.[4] It later amended the first count to a class A felony alleging a total weight of methamphetamine at more than three grams,[5] and then amended it again to Attempted Dealing in Methamphetamine as a class A felony.[6]

Against the trial judge's recommendation, Clark initially elected to represent himself and requested only stand-by counsel. He filed a motion to suppress his confession as well as the evidence found in the black bag and in his trunk. After a series of hearings, discovery requests, and depositions, the trial court denied his motion.[7] Clark then reconsidered his decision to proceed pro se and requested a public defender. One was appointed for him and Clark's counsel properly renewed his objections at trial.

At trial, the State introduced evidence that the weight of the methamphetamine found in Clark's bag was 1.22 grams, additional methamphetamine powder found in the tool box from Clark's trunk weighed 1.39 grams, and the collective weight of the 192 pseudoephedrine pills from Clark's bag weighed 28.07 grams. As evidence that Clark was attempting to manufacture more than three grams of methamphetamine, the State called Indiana State Trooper Maggie Shortt, who was assigned to a special methamphetamine suppression unit. Trooper Shortt

---

[2] Ind. Code § 35-48-4-1.1(a)(2)(C) (2008).

[3] Ind. Code § 35-48-4-14.5(e) (2008).

[4] Ind. Code § 35-48-4-11(1) (2008).

[5] Ind. Code § 35-48-4-1.1(b)(1).

[6] Ind. Code § 35-48-4-1.1(a)(1)(A), (b)(1); Ind. Code § 35-41-5-1 (2008). It is not clear from the record what became of the other two counts, but at trial Clark was only charged with the class A felony.

[7] Clark then filed a motion to correct error which the trial court also denied.

4

testified, over Clark's objection, that the manufacturing method present in Clark's trunk would, she expected, typically yield a weight in methamphetamine of roughly fifty percent the amount of pseudoephedrine. The jury found Clark guilty as charged and he received a forty-five year sentence.

Clark appealed, arguing that his motion to suppress was improperly denied and that Trooper Shortt should not have been allowed to testify with respect to a conversion ratio of pseudoephedrine to methamphetamine. (Appellant's Br. at 1.) The Court of Appeals affirmed. Clark v. State, 977 N.E.2d 459 (Ind. Ct. App. 2012). We granted transfer, Clark v. State, 980 N.E.2d 325 (Ind. 2012) (table), thereby vacating the Court of Appeals opinion, Ind. Appellate Rule 58(A).

**Standard of Review**

We review the denial of a motion to suppress in a manner similar to reviewing the sufficiency of the evidence. Holder v. State, 847 N.E.2d 930, 935 (Ind. 2006). We consider only the evidence favorable to the trial court's ruling, alongside substantial uncontradicted evidence to the contrary, to decide if that evidence is sufficient to support the denial. Id.

However, though Clark presents this appeal as the denial of a motion to suppress, his case proceeded to trial where he renewed his objection to the admission of this evidence. In such an instance "the question of whether the trial court erred in denying a motion to suppress is no longer viable." Cochran v. State, 843 N.E.2d 980, 982 (Ind. Ct. App. 2006), trans. denied, cert. denied. "[A] ruling on a pretrial motion to suppress is not intended to serve as the final expression concerning admissibility." Joyner v. State, 678 N.E.2d 386, 393 (Ind. 1997) (quoting Gajdos v. State, 462 N.E.2d 1017, 1022 (Ind. 1984)). Direct review of the denial of a motion to

5

suppress is only proper when the defendant files an interlocutory appeal.[8] See Kelley v. State, 825 N.E.2d 420, 424 (Ind. Ct. App. 2005). In Clark's case, the appeal is best framed as challenging the admission of evidence at trial.[9] Id.

The general admission of evidence at trial is a matter we leave to the discretion of the trial court. Nicholson v. State, 963 N.E.2d 1096, 1099 (Ind. 2012). We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. Id.

---

[8] We note, though, that Clark expressed a clear intent to seek an interlocutory appeal at the conclusion of his arguments on his motion to suppress, asking for certified transcripts of the hearing "so I can appeal the decision if need be." (Tr. at 311.) The trial court judge, however, actively dissuaded him from seeking an interlocutory appeal by informing Clark that the motion would not be certified even if he requested it, telling him "You can't just appeal something because you don't like it." (Tr. at 311–12.)

[9] The biggest implication from this shift in standard of review is that when "the foundational evidence [at trial] is not the same [as at the suppression hearing], the trial court must make its determination based upon the testimony and evidence presented at trial." Kelley, 825 N.E.2d at 426. But at the same time, "the trial court may reflect upon the foundational evidence from the motion to suppress hearing when that evidence is not in direct conflict with the evidence introduced at trial" and also "the courts should consider evidence from the motion to suppress hearing which is favorable to the defendant and which has not been countered or contradicted by foundational evidence offered at the trial." Id.

Ultimately this has little impact on our consideration of Clark's case because Clark's objections to the constitutionality of the evidence at trial were expressly based on the grounds and evidence presented in the pre-trial suppression hearings and it is clear that the trial court's rulings on admissibility were based on that evidence and the grounds presented in his order on the motion to suppress. And in any event, the critical circumstances leading to our conclusion today were presented as evidence at both the suppression hearing and the trial.

**Discussion**

The Fourth Amendment to the U.S. Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches and seizures conducted without a warrant supported by probable cause. U.S. Const. amend. IV; Berry v. State, 704 N.E.2d 462, 464–65 (Ind. 1998). As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception. Mapp v. Ohio, 367 U.S. 643, 649–55 (1961) (extending exclusionary rule to state court proceedings). It is the State's burden to prove that one of these well-delineated exceptions is satisfied. Berry, 704 N.E.2d at 465.

Here, the officers encountered Clark, Collins, and Eller and after a short period of time Clark admitted that there was marijuana in the black bag that he had been carrying. When the officers searched the bag they found not only marijuana but items indicating that Clark might be involved in dealing methamphetamine. This led the officers to Clark's car, from which they could detect the smell of burnt marijuana coming out of open windows. Concerned that there was an active methamphetamine lab in the car, the officers unlocked the vehicle's trunk, removed a rolling case capable of holding a portable meth lab and searched it. Finding the lab inactive, they replaced it, closed the trunk, and then conducted another search of the car using a K9 officer.

We agree with the State that Clark's admission that there was marijuana in his bag gave the officers probable cause to arrest Clark for possessing marijuana. (Appellee's Br. at 15); see Robles v. State, 510 N.E.2d 660, 664 (Ind. 1987) ("Probable cause exists where the facts and circumstances within the knowledge of the officer making the search, based on reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed."). Clark, after all, had just admitted that he was committing the crime.

7

Likewise, the smell of burnt marijuana emanating from Clark's car windows, to a trained officer, would provide such an officer with probable cause sufficient to justify searching at least the open interior of the car. State v. Hawkins, 766 N.E.2d 749, 751–52 (Ind. Ct. App. 2002), trans. denied; see also State v. Hobbs, 933 N.E.2d 1281, 1285–86 (Ind. 2010) (automobile exception to warrant requirement justifies warrantless search of readily mobile vehicle found in non-residential area regardless of defendant's proximity and present capacity to control vehicle). And the officers' belief that Clark might have a rolling methamphetamine lab nearby—possibly in the trunk of his car—was a sufficiently exigent circumstance to justify a search of the trunk carried out to confirm or deny that belief. See Holder v. State, 847 N.E.2d 930, 937 (Ind. 2006) (noting hazards of methamphetamine manufacturing process in context of exigent circumstances analysis). Finally, there can be no question that the search of the vehicle by Falco was not a search for purposes of Fourth Amendment analysis and thus no degree of suspicion whatsoever would ordinarily be required prior. Hobbs, 933 N.E.2d at 1286 (citing Illinois v. Caballes, 543 U.S. 405, 409 (2005)).[10]

---

[10] The State also argues that the search of Clark's car was justified as a warrantless search incident to Clark's arrest. (Appellee's Br. at 16–17.) This exception only permits "a search of the arrestee's person and the area within his or her control." VanPelt v. State, 760 N.E.2d 218, 222 (Ind. Ct. App. 2001), trans. denied. The exception is justified by "the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as the need to prevent the destruction of evidence of the crime," all "things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control." Id. (quoting Preston v. United States, 376 U.S. 364, 367 (1964)).

This exception extends to the lawful arrest of a vehicle's occupant, which permits a search of the passenger compartment of the automobile and containers found therein. Stark v. State, 960 N.E.2d 887, 889 (Ind. Ct. App. 2012) (citing New York v. Belton, 453 U.S. 454, 460 (1981)), trans. denied. It is limited in operation to "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. (quoting Arizona v. Gant, 556 U.S. 332, 351 (2009)).

So here, though Clark was not within reaching distance of his vehicle when it was searched we agree that the exception would arguably apply as the smell of burnt marijuana would make it reasonable for the officers to believe that evidence of the offense to which Clark admitted—possessing marijuana—

All of this, however, rests on a threshold requirement that the officers' initial stop of Clark and the subsequent warrantless search of Clark's bag satisfied the requirements of the Fourth Amendment. For the reasons we discuss below, they did not.

## I. The Seizure of Clark

Encounters between law enforcement officers and public citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and some of which do. Finger v. State, 799 N.E.2d 528, 532 (Ind. 2003). Consensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis. Id. Nonconsensual encounters do, though, and typically are viewed in two levels of detention: a full arrest lasting longer than a short period of time, or a brief investigative stop. Id. The former of these requires probable cause to be permissible; the latter requires a lower standard of reasonable suspicion. Id.

As we said, it is undeniable that the officers here had probable cause to arrest Clark once he admitted to possessing marijuana. But at issue is how to categorize the encounter up until that point and whether it complied with—or even needed to comply with—the Fourth Amendment.

Determining whether this was a consensual encounter or some level of detention "turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business." Id. (citing California v. Hodari D., 499 U.S. 621, 628 (1991)). The test is objective—not whether the particular citizen actually felt free to leave, but "whether the officer's words and actions would have conveyed that to a reasonable

would be found inside. The search-incident exception alone, however, would not have justified the search of Clark's trunk.

9

person." Hodari D., 499 U.S. at 628 (citing United States v. Mendenhall, 446 U.S. 544 (1980)). Examples of facts and circumstances that might lead a reasonable person to believe that he or she was no longer free to leave could include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Overstreet v. State, 724 N.E.2d 661, 664 (Ind. Ct. App. 2000) (citing Mendenhall, 446 U.S. at 554), trans. denied.

The State argues that "Sergeant McHenry's initial approach to Clark was a consensual encounter," a position that the trial court appears to have rejected although the State presented this position at the suppression hearing.[11] (Appellee's Br. at 11.) "Sergeant McHenry . . . approached three individuals, including Clark, stated he would like to speak with them, asked them to sit on the ground, and asked for identification." (Appellee's Br. at 12.) "Sergeant McHenry did not approach with his weapon drawn, did not handcuff Clark until after he arrested Clark, and there were only two officers on the scene—and their vehicles were not present at in [sic] the storage building, much less with sirens and lights pointing at Clark." (Appellee's Br. at 13.) But in our view, the evidence presented to the trial court reflects a less friendly encounter than the State portrays.

At the suppression hearing, Clark questioned Sergeant McHenry about the encounter, asking "[w]hen you entered the building, did you demand anything of the three?" (Tr. at 118.) Sergeant McHenry responded "Yes. I ordered them to stop, stand still, so we can approach you based on the grounds we were going to identify you and find out what three people were doing in the storage shed at that late hour." (Tr. at 118.) Dunlap likewise testified at the hearing that the officers encountered the men and "told them to stop and stand still." (Tr. at 213.)

---

[11] The trial court's order on Clark's motion to suppress does not treat the encounter as consensual or cite the relevant case law to do so. Rather, the trial court analyzes the issue solely through the lens of a reasonable investigatory stop requiring—and in its view supported here by—reasonable suspicion.

At trial, however, Sergeant McHenry recalled the encounter somewhat differently, testifying that "I just called to the gentlemen, 'Hello. I would like to speak with you.' And started talking to them in a conversation." (Tr. at 423.) But on cross-examination, he was asked "Did you tell them, 'Sit your butts on the ground'?" (Tr. at 463.) To which he replied "I can't remember the exact verbiage, but I asked and they complied. There was no argument. There was no discussion." (Tr. at 463.) And Officer Lundgren testified that "I believe [Sergeant McHenry] told them, 'Stop' or 'Stay where they were at.'" (Tr. at 508.)

The evidence thus leaves the picture of the officers' expression of authority muddled, although to be sure one of those four characterizations of the encounter (Sergeant McHenry's description from the trial) is an outlier.[12] But regardless, when combined with another facet of the encounter—the demand that Clark, Eller, and Collins sit down—we believe the facts and circumstances take this case from the realm of a consensual encounter and into some level of detention requiring the protections of the Fourth Amendment.

At the suppression hearing, Sergeant McHenry testified that he made the three men sit on the ground because "[t]here was three of them and only me and Officer Lundgren. It was unknown what activity they were up to. It was safer to have them sit on the ground." (Tr. at 146.) At trial he further explained that "by having them sit on the ground, if they are going to do something that is going to be a danger to me, another officer, or that person that was with us it is

_____

[12] The full record on appeal reveals the answer with absolute clarity. Officer Lundgren was wearing a body mic throughout the encounter that recorded nearly all of the officers' conversations from meeting with Dunlap to the search of Clark's car. More specifically, it recorded precisely what Sergeant McHenry said and the tone with which he said it when he encountered Clark, Eller, and Collins. At least some portions of this recording were played on multiple occasions during the suppression hearing, with Clark trying—valiantly but unsuccessfully—to have it admitted as substantive evidence no less than three times. He also cited it extensively in his motion to correct error, quoting again the language used by the officers. Nevertheless, it was not admitted as substantive evidence and we cannot (and also need not) consider it here. But we continue to urge those who would proceed pro se to think carefully about their decision to forego the services of trained legal counsel.

11

going to be more apparent and very more clear." (Tr. at 424.) "They are going to have to go through a lot more body language to move so I can be much safer for myself." (Tr. at 424.) But aside from the fact that there were three men at the storage locker, and only two police officers accompanied by one civilian, the record reflects no indication of a threat to officer safety. The men calmly complied with Sergeant McHenry's demands, they displayed no weapons, and they made no belligerent or hostile comments or gestures.

Thus, even if Sergeant McHenry did approach the three men in a calm manner and politely say "Hello, I would like to speak with you," once he required the men to sit on the ground so he could respond more quickly to their movements—once he employed his authority to control and restrict their freedom to depart—the encounter moved past what would be considered "consensual." No reasonable person would have believed they were free to simply get up and walk away under those circumstances.[13] Cf. Woodson v. State, 960 N.E.2d 224, 227–28 (Ind. Ct. App. 2012) (encounter not consensual when officer handcuffed defendant for being loud and belligerent); Crabtree v. State, 762 N.E.2d 241, 244–46 (Ind. Ct. App. 2002) (encounter not consensual when officer responding to call of loud stereo saw defendant, had not observed illegal activity, but approached defendant with flashlight shining on him and ordered defendant to get his hands up—even when direction to raise hands was for officer safety).

Even though the encounter was not consensual, Sergeant McHenry still did not need probable cause to detain Clark if he was conducting merely a brief investigatory stop falling short of traditional arrest. This sort of brief detention, commonly called a Terry[14] stop, permits an officer "to stop and briefly detain a person for investigative purposes if the officer has

---

[13] We emphasize that we are not disparaging Sergeant McHenry's professional assessment of the precautions he believed necessary. The point is only that given the circumstances here, those actions placed the encounter under the protections of the Fourth Amendment.

[14] Terry v. Ohio, 392 U.S. 1 (1968).

reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." Armfield v. State, 918 N.E.2d 316, 319 (Ind. 2009) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "Such reasonable suspicion must be comprised of more than hunches or unparticularized suspicions." State v. Murray, 837 N.E.2d 223, 225–26 (Ind. Ct. App. 2005), trans. denied.

In other words, the stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981). "[T]he totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. at 417–18; see also Armfield, 918 N.E.2d at 319 (quoting State v. Bulington, 802 N.E.2d 435, 438 (Ind. 2004)). In assessing the whole picture, we must examine the facts as known to the officer at the moment of the stop. Lyons v. State, 735 N.E.2d 1179, 1183 (Ind. Ct. App. 2000), trans. denied. We review findings of reasonable suspicion de novo. Id. This is necessarily a fact-sensitive inquiry.

The trial court found that "the officers were called to investigate suspicious activities at the storage facility" and so "were authorized to briefly detain the suspects and to protect themselves by controlling the placement of the individuals and requesting identification." (App. at 80.) The State argues that the officers' investigatory stop was supported by reasonable suspicion because Dunlap contacted police after growing concerned that Collins was living in his rental unit, and if so was violating his rental contract. (Appellee's Br. at 14–15.) We disagree.

The State's argument is premised on the theory that Collins was trespassing by living in his rental unit. (Appellee's Br. at 14–15.) But this theory is not borne out by the record. A person commits criminal trespass when, not having a contractual interest in a property, he or she knowingly or intentionally enters (or refuses to leave) the real property of another after having been asked to leave. Ind. Code § 35-43-2-2(a)(1), (2) (2008). Denial of entry may be through personal communication, whether oral or written. Ind. Code § 35-43-2-2(b)(1).

13

Nothing in the record indicates that Dunlap denied Collins entry into the storage facility. Dunlap asked Collins if Collins was living in the storage facility and Collins denied doing so. Nothing indicates that Dunlap then told Collins to leave and not return, either orally or in writing.[15] And most particularly, nothing in the record indicates that Dunlap relayed any such denial of entry to Sergeant McHenry or Officer Lundgren or even used anything close to the word "trespassing."

As Clark puts it, the officers were there "to insure a peaceful meeting between a landlord and a tenant regarding an aspect of a contractual lease agreement." (Appellant's Br. at 4, 7.) We think this is the best assessment of their purpose. Dunlap was not reporting the commission of a criminal trespass (or, for that matter, a drug-related offense)—what Dunlap wanted from the police was support in removing Collins from the facility, if in fact Collins was inside and living in the unit.[16] It would be the same as a landlord asking the police to accompany him as he asked a tenant for back payment on rent, or sought to enforce some common provision of a rental agreement like not having a grill on the balcony. Simply because the police are willing and available to be present does not mandate turning an otherwise civil matter into a criminal investigation.

And even if Sergeant McHenry and Officer Lundgren subjectively believed in good faith that Collins was or might be criminally trespassing, "simple 'good faith on the part of the arresting officer is not enough.'" Terry v. Ohio, 392 U.S. 1, 22 (1968) (quoting Beck v. Ohio,

---

[15] In fact, at the suppression hearing Dunlap testified that it was his understanding that renters could not live in the storage units—but he could not actually confirm that this was a provision in the rental contract. Nor was the rental contact made a part of the record.

[16] And at the end of the night, Collins was not only not charged with criminal trespass, but he was the only one of the three men to walk away free—even though Dunlap observed that the personal items in his storage unit were stored "uniquely different than other rental people." (Tr. at 236.) Collins had a hutch, a rug, a couch, liquor, and clothes in the unit, all tending to give the appearance that he was, in fact, living there.

14

379 U.S. 89, 97 (1964)). "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects' only in the discretion of the police." Beck, 379 U.S. at 97. The protection and structure provided by the Fourth Amendment "becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." Terry, 392 U.S. at 21. And "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21–22. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." Id. at 22.

As we have said, reasonable suspicion must be based on specific and articulable facts— an objective manifestation—and not an officer's unparticularized hunch. Here, such specific and articulable facts are lacking.

Sergeant McHenry testified that the storage facility was located in a bad neighborhood where crimes and drugs are common, but had no reason to suspect drug or narcotics activity was going on inside when he arrived. And the facility's location alone cannot support a finding of reasonable suspicion. See Bridgewater v. State, 793 N.E.2d 1097, 1100 (Ind. Ct. App. 2003) ("presence in a high-crime neighborhood alone may not constitute reasonable suspicion" but "can be considered as a factor in the totality of the circumstances confronting an officer at the time of a stop"), trans. denied. When he arrived, Dunlap advised him that Collins might be inside the facility and that Collins might be residing or sleeping at the facility, but Dunlap could not confirm that Collins was actually the person inside at that point. When Sergeant McHenry encountered Clark, Eller, and Collins, he did not—and could not—know anything about the men

15

or what they were doing.[17] [18]  They did not identify Collins until the men were seated on the ground and had provided their identification.

Thus viewed in an objective totality, the two officers entered a twenty-four-hour storage facility located in a rough neighborhood and found three men standing outside one of the storage units.  One man was closing the storage unit door and the other two were holding bags.  The officers were aware that the owner of the facility believed a renter was living in a storage unit, but the officers at that time did not know if one of the three individuals they encountered was that potential squatter.  In short, the officers encountered three men that they did not know, in a place where people are permitted to be, doing something completely in line with the expected activity at that location, at a time when people might be expected to be found there (or, given that it was a twenty-four-hour facility, at least not at a time where people are not permitted).

Notably, they saw nothing illegal or responsive to Dunlap's complaint or anything appearing to constitute narcotics use, dealing, or manufacturing.  None of the men turned away, evaded, or fled when officers shouted at them.  See id. (avoiding or turning away from police also not enough to constitute reasonable suspicion alone but headlong flight is "certainly suggestive" of wrongdoing (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000))). Even considering the presence of the facility in a high-crime neighborhood, those facts would not warrant a man of reasonable caution in the belief that criminal activity was afoot and the detention of Clark was appropriate.  His seizure was therefore impermissible under the Fourth Amendment.  Cf. Crabtree, 762 N.E.2d at 246–47 (investigatory stop justified by reasonable

---

[17] Sergeant McHenry had, however, already run a check to see if Collins had any outstanding warrants. He did not.

[18] Officer Lundgren also testified that they did not know who Clark, Eller, and Collins were when the officers encountered them outside the storage unit.  He "was just advised that possibly Dennis Collins might be living in the storage facility there." (Tr. at 170.)

suspicion when officer responded to report of loud car stereo at 4:30 in the morning and found defendant crouched behind car, peeking over hood and hiding from patrol cars).

## II.  The Fruit of the Poisonous Tree

Generally speaking, evidence obtained pursuant to an unlawful seizure must be excluded under the fruit of the poisonous doctrine.  Sanchez v. State, 803 N.E.2d 215, 221 (Ind. Ct. App. 2004) (citing Wong Sun v. United States, 371 U.S. 471, 485 (1963)), trans. denied.  This extension of the exclusionary rule bars evidence directly obtained by the illegal search or seizure as well as evidence derivatively gained as a result of information learned or leads obtained during that same search or seizure.  Id.  The question is if the derivative evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun, 371 U.S. at 488.  In making this determination, courts generally consider "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct."  Sanchez, 803 N.E.2d at 221 (quoting United States v. Green, 111 F.3d 515, 521 (7th Cir. 1997)).  The defendant must first prove the Fourth Amendment violation and that the evidence was a "fruit" of that search; the State must then show that the evidence may nevertheless be admitted.  Herald v. State, 511 N.E.2d 5, 8 (Ind. Ct. App. 1987) (citing Pirtle v. State, 263 Ind. 16, 323 N.E.2d 634 (1975)), trans. denied.

Clark argues that his confession and the evidence seized from his black bag should have been suppressed as the product of his illegal detention.  (Appellant's Br. at 10.)  He also argues that the evidence seized from his car should have been suppressed as the fruit of the black bag search's poisonous tree.  (Appellant's Br. at 11.)  Applying the three factors from Sanchez, he argues that the time between the search of the black bag and the search of his car is insignificant, there were no intervening circumstances, and that "it is clear that the officers went too far" in considering the purpose and flagrancy of their misconduct.  (Appellant's Br. at 12.)

17

In response, the State presents nothing. The State rests its entire argument on its theory that Clark was lawfully detained and the black bag lawfully searched. "Therefore, Clark's fruit of the poisonous tree argument is inapplicable to these circumstances. As such, no analysis pursuant to Wong Sun v. United States, 371 U.S. 471 (1963) is necessary." (Appellee's Br. at 17.) Again we disagree.[19]

---

[19] Even if we assumed Clark's detention was supported by reasonable suspicion, and his admission freely given, that would still leave the search of his bag in constitutional doubt. The trial court upheld the search because Clark admitted to ownership of the bag and admitted that it contained marijuana and therefore the bag was subject to search for weapons "for purposes of officer safety" and because the admission provided probable cause for the search—and apparently obviated the warrant requirement. (App. at 80–81.) Neither is necessarily a given.

A search justified on Terry grounds is limited to "the individual's outer clothing for weapons if the officer reasonably believes that the individual is armed and dangerous." Westmoreland v. State, 965 N.E.2d 163, 166 (Ind. Ct. App. 2012) (quoting Terry, 392 U.S. at 30). However, there first must be more than a generalized suspicion that the individual presents a threat to officer safety—"[t]here must exist articulable facts to support an officer's reasonable belief that the particular individual is armed and dangerous." Tumblin v. State, 736 N.E.2d 317, 322 (Ind. Ct. App. 2000), trans. denied. Here, there are no such specific and articulable facts so as to justify a pat-down search of Clark as part of an initial investigatory stop and even if there were, clearly that pat-down search could not extend to Clark's bag.

But neither does Clark's admission—providing probable cause to arrest him for marijuana possession—necessarily permit a warrantless search in and of itself. Even though the admission would likely provide probable cause to believe that the marijuana was in the bag, as we have said "[t]he existence of probable cause, of course, does not relieve police from the warrant requirement. 'Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.'" Robles v. State, 510 N.E.2d 660, 664 (Ind. 1987) (quoting United States v. Jacobson, 466 U.S. 109, 114 (1984)). Thus, absent an exception or consent (which was not given), Clark's admission would be the basis for a warrant to search the bag, not grounds to just search the bag without a warrant.

Two such warrant exceptions might be rationally argued (though the State offers up neither, instead incorrectly—or incompletely—arguing that "[t]he officers had probable cause to search Clark's bag after Clark admitted to possessing marijuana." (Appellee's Br. at 15.)). First, exigent circumstances can sometimes justify a warrantless search when there is probable cause, but this exception "is not 'a per se rule to be applied indiscriminately to . . . every object that has the capacity for movement. Rather, its application should depend upon an evaluation of attendant circumstances.'" Id. at 664–65 (quoting United States v. Valen, 479 F.2d 467, 470 (3rd Cir. 1973)). Second might be the search incident to arrest

An initial issue is whether Clark's statement confessing to possessing marijuana is itself a fruit of the poisonous tree. We believe the answer to this question is compelled by comparison to the facts of Wong Sun and related U.S. Supreme Court cases.

In Wong Sun, federal agents arrested James Toy under circumstances that were found to not be supported by probable cause. Wong Sun, 371 U.S. at 473–74, 484. Toy then provided a statement incriminating another individual for narcotics possession. Id. at 474. That individual then provided a pseudonym for the dealer who provided the narcotics and Toy identified that dealer's real name as Wong Sun. Id. at 475. Wong Sun was then arrested, arraigned, and released. Id. at 475. Some days later he voluntarily returned and provided a confession. Id. at 476.

_____

exception discussed above, whereby a police officer who lawfully arrests a person "may conduct a search of the arrestee's person and the area within his or her control." VanPelt, 760 N.E.2d at 222. This exception allows "'a contemporaneous search'" of that arrestee or the area within his control to look for "'weapons or for the fruits of or implements used to commit the crime.'" Id. (quoting Preston v. United States, 376 U.S. 364, 367 (1964)).

But while the exigent circumstances exception might apply because Clark's bag was easily transportable and contained easily disposed-of drug evidence, and the search incident exception might apply because Clark admitted the bag contained the implements of the crime he committed (and also because it might conceivably contain a weapon that could harm the officers), the record is not clear in supporting either.

For one thing, the record is clear that Clark placed the bag on the ground and up against a wall before complying with Sergeant McHenry's order to sit down. But it is not clear whether the bag was still in an area that could be construed as Clark's "immediate control." In addition to not indicating how far away from Clark the bag was, the record shows that Clark was not in a position to move or reach for the bag surreptitiously or in a way to either seize the bag and run or open it and reach inside. In fact, Sergeant McHenry's testimony indicates that the exact opposite was the case—preventing actions like that was the very reason why he had Clark sit on the ground in the first place.

Nevertheless, because we find Clark's admission to be the direct result of his illegal detention we need not resolve such a hypothetical assessment of the search of his bag.

The U.S. Supreme Court held that Toy's declarations were the fruits of the federal agent's illegal arrest and should have been suppressed. "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Id. at 485. It noted that Toy's statement was given immediately after officers forcibly entered his home, followed him to his bedroom, and handcuffed and arrested him. Id. at 486. "Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." Id.[20]

Brown v. Illinois, 422 U.S. 590 (1975), which followed Wong Sun, reinforces our belief that Clark's statement was inadmissible. There, Brown was arrested without probable cause and without a warrant. Id. at 591. He was then read his Miranda rights and while in custody made two incriminating statements. Id. The Illinois Supreme Court held that the Miranda warnings served to break the causal link between the illegal arrest and the incriminating statement and therefore the statements were sufficiently an act of free will to purge the primary taint of the unlawful invasion. Id. at 596–97. The U.S. Supreme Court reversed. Id. at 605.

The Court noted the overlap between the Fourth and Fifth Amendment, and how the exclusionary rule can be used to effectuate interests under both, id. at 599–601, but said that exclusion of a confession made without Miranda warnings might be required to guarantee the protections of the Fifth Amendment but would not necessarily deter a Fourth Amendment violation, id. at 601. So a statement considered "voluntary" for Fifth Amendment purposes would not necessarily break the causal chain of Wong Sun; it must also "be 'sufficiently an act of free will to purge the primary taint.'" Id. at 602 (quoting Wong Sun, 371 U.S. at 486).

---

[20] By comparison, Wong Sun's statement (which implicated Toy) was still admissible at trial because he was released after a lawful arraignment, several days passed, and then he returned voluntarily. Wong Sun, 371 U.S. at 491. Thus "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" Id. (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

Adopting a per se rule that <u>Miranda</u> warnings alone could sufficiently attenuate the taint of an illegal arrest would substantially dilute the effect of the exclusionary rule in protecting the Fourth Amendment interests at stake by "making the warnings, in effect, a 'cure-all.'" <u>Id.</u> The Court therefore rejected the Illinois Supreme Court's rule. <u>Id.</u> at 603.

Nevertheless, the Court also rejected an inverse rule, where the lack of <u>Miranda</u> warnings would automatically mean the taint had not been purged, because "[i]t is entirely possible, of course . . . that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." <u>Id.</u> Thus "[t]he question whether a confession is the product of a free will under <u>Wong Sun</u> must be answered on the facts of each case. No single fact is dispositive." <u>Id.</u> The warnings are "an important factor," but "not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." <u>Id.</u> at 603–04.

Weighing these factors, the Supreme Court found that Brown's statement should have been suppressed because it occurred within two hours of his initial arrest and no intervening event occurred of any significance whatsoever, and it likened his situation much closer to Toy than Wong Sun—so close that the Court found permitting Brown's statements would require overruling <u>Wong Sun</u>. <u>Id.</u> at 604 n.11, 605. Furthermore, the illegal arrest "had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged . . . that the purpose of their action was 'for investigation' or for 'questioning.'" [21] <u>Id.</u> at 605. "The arrest, both in design and

---

[21] Brown was arrested at gunpoint as he entered his home, having been named as the acquaintance of the victim (but not a suspect) in an unsolved murder. <u>Brown</u>, 422 U.S. at 592. The officers entered his home without a warrant, searched it, and then waited for Brown to return. <u>Id.</u> at 593. He was searched, told he was under arrest for the murder, and driven to a police station interrogation room before being read his <u>Miranda</u> rights. <u>Id.</u> at 593–94.

in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." Id. The manner of Brown's arrest "gives the appearance of having been calculated to cause surprise, fright, and confusion." Id.

Analysis of the factors for attenuation here leads us to the same result. The time elapsed between Clark's unlawful detention and his statement is exceptionally brief. In Brown, the Court highlighted an elapsed time of less than two hours and in Wong Sun the inculpatory statements were given "almost immediately." Wong Sun, 371 U.S. at 486. Similarly here, Sergeant McHenry testified that he made contact with Clark, Eller, and Collins at thirteen minutes after midnight. Sergeant McHenry and Officer Lundgren ordered the men to the ground, approached, checked the storage unit for additional individuals, and by sixteen minutes after midnight Sergeant McHenry had questioned Clark about the bag and obtained Clark's statement about possessing marijuana. An elapsed time of three minutes is short enough that we could reasonably construe it as "almost immediately," and like in Brown we see "no intervening event of significance whatsoever." Brown, 422 U.S. at 604.

Moreover, while we acknowledge that the circumstances of Clark's detention were less dramatic and intense than those leading to the arrests of Toy and Brown, falling short of a full arrest and lacking the violence and overt threats of violence, we cannot discount the "quality of purposefulness" present in the three minutes between the initial encounter and Clark's detention. Though the officers were on the scene to support Dunlap as he potentially confronted Collins, after placing Clark in a position of physical control and restraint the questioning almost immediately shifted to an inquisition concerning the contents of Clark's bag and whether there was contraband inside—a line of inquiry wholly unrelated to the initial "criminal trespass" investigation and unsupported by any form of reasonable suspicion or probable cause. (Tr. at 107, 294.)

Clark initially did not directly answer the question, but said that there was "stuff" in the bag. (Tr. at 178.) And at that point, as Clark puts it well, "when he apparently didn't give the officers a detailed enough answer they threatened him with the use of their canine." (Appellant's

Br. at 13.) Specifically, the officers informed Clark that they had a K9 outside and that they would bring the dog in and it would alert to any narcotics in the bag.

Thus, in a very short period of time what began as (at most) police support of an essentially civil matter turned quickly into a fishing expedition for narcotics employing threats of a K9 officer as the bait and hook—an expedition bordering on interrogation and wholly unsupported by probable cause or reasonable suspicion, or anything other than the officers' apparent hunch.[22] See Sanchez, 803 N.E.2d at 221 (though defendant's behavior in leaning in passenger window of car may be consistent with possible narcotics behavior, "the Officers did not observe any sort of transaction or interaction between Sanchez and the individual in the car. The mere fact that he was leaning in a car window is simply not enough to meet the State's burden in this case."). Moreover, Clark was not read his Miranda rights until long after the admission had been obtained and the evidence secured.[23] Thus, this "important factor" is wholly

---

[22] Vague responses are not illegal or necessarily indicative of criminal behavior. See Wardlow, 528 U.S. at 125 ("refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure"). And in a similar circumstance—the "knock and talk"—we have held that "residents have the right to deny officers admission and to refuse to answer questions." Hardister v. State, 849 N.E.2d 563, 570 (Ind. 2006). "If residents exercise this right, officers generally must leave and secure a warrant if they want to pursue the matter." Id. Here as well, Clark had the full right to refuse to answer police questions without his exercise of that right forming the sole basis for reasonable suspicion or probable cause.

[23] Which was not an omission—it was a deliberate choice not to Mirandize Clark. Sergeant McHenry said as much, when he said the reason why he chose not to read Clark his Miranda warnings was "I had no reason to formally charge you with any charge or detain you on any charge at that time. I was merely conducting an initial investigation to the situation I was exposed to." (Tr. at 114.) We are not saying that Miranda warnings are required in Terry stops, but the officer's decision clearly reflects the general "fishing" nature of the questioning taking place in the context of a Terry stop unsupported by reasonable suspicion.

absent.  Brown, 422 U.S. at 603.  The officers here, as in Brown, simply "embarked upon this expedition for evidence in the hope that something might turn up." [24]  Id. at 605.

We therefore conclude that Clark's statement confessing to possessing marijuana in his black bag was not such an act of free will as to purge the primary taint of his unlawful detention and the statement should have been suppressed.  And though it probably would seem obvious, the same must be true of the evidence found inside Clark's bag after it was searched.  The search was conducted immediately after Clark's admission, with no time or intervening event and was an effort to validate the response to the officer's questioning—questioning, as we have said, that was unsupported by probable cause or reasonable suspicion that Clark was engaged in narcotics dealing or possession.  Accordingly, it was error to admit the evidence found in Clark's bag.

The issue then remains whether it was error to admit the evidence found in Clark's car.  His windows were rolled down and the smell of burnt marijuana was evident to the officers as they approached.  They opened his trunk and the container inside because they were concerned that an active rolling meth lab might be contained within, but they then brought a K9 officer to circle the car.  That K9 alerted on actual marijuana found on the trunk, and that K9 alert was used as the probable cause basis for a warrant to search the vehicle again.

We do not find the causal connection between the detention and the search so attenuated as to dissipate the taint of the initial Fourth Amendment violation.  The time elapsed between the detention and the search of the vehicle was very short—within only a few minutes of Clark's admission, the officers are looking for the keys to his trunk.  And there were no significant intervening circumstances.  The officers went almost straight from the search of the bag to a

---

[24] It does not—cannot—matter that Sergeant McHenry and Officer Lundgren's hunch paid out in the form of Clark's confession and the later discoveries.  "It is the law that the fruits of the search cannot be used to support or justify an illegal search."  Manson v. State, 249 Ind. 53, 56, 229 N.E.2d 801, 803 (1967).

search for—and of—Clark's vehicle. The only events that occurred during this time were Sergeant McHenry running Clark's name to check for warrants and Clark being placed in Officer Lundgren's patrol car. Neither, however, is significant enough to attenuate the connection between the Fourth Amendment violation and the evidence seized.[25] Finally, while the officers' search of Clark's vehicle was at least partially motivated by a concern for an active meth lab on the premises, we cannot discount the initial purposefulness of their conduct.[26]

But in addition to when the connection between the illegal search or seizure and the discovery of the evidence has become so attenuated as to dissipate the taint of the illegal action, the fruit of the poisonous tree doctrine also does not apply when the derivative evidence obtained has an independent source. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920), overruled on other grounds by United States v. Havens, 446 U.S. 620 (1980); see also Wong Sun, 371 U.S. at 485. Nor must the evidence be excluded if it would inevitably have been properly obtained. Nix v. Williams, 467 U.S. 431, 443–44 (1984). These two additional exceptions exist because when they are met, exclusion of the derivative evidence "would put the police in a worse position than they would have been in absent any error or violation" and the deterrence basis of the exclusionary rule would be lost.[27] Id. The burden is also on the State to prove that either of these exceptions is satisfied. Id. at 444 (inevitable discovery); Nardone v. United States, 308 U.S. 338, 341 (1939) (independent source).

---

[25] Sergeant McHenry ran the warrant check at sixteen minutes after midnight. Seven minutes later, the check came back showing a possible outstanding warrant for Clark in Florida, but within another five minutes Sergeant McHenry was told that the warrant was not extraditable and therefore not a valid basis for detaining Clark. A determination that a defendant is not wanted on an outstanding warrant cannot break the chain here, nor can the act of moving a defendant from one police-controlled location to another.

[26] To say nothing of the manner of searching the vehicle: searching the interior based on an open-air sniff of burnt marijuana, then taking Clark's keys to open the trunk and containers, then walking the K9 around the car, and only then asking for consent.

[27] This is the inverse rationale of the exclusionary rule itself, which prevents the prosecution from being "in a better position than it would have been in if no illegality had transpired." Nix, 467 U.S. at 443.

Here, not only has the State chosen not to argue the existence of one of these exceptions on appeal, but we find neither is supported by the record. No independent source pointed the officers in the direction of Clark's vehicle, much less provided cause to believe it contained a meth lab. Nothing indicates that the officers learned this, for example, from Collins, Eller, or Dunlap. And while it is true that the K9 alerted to the presence of marijuana in the vehicle, that was only after the officers had located the car by questioning Clark, approached it, searched it, found contraband, and then returned with the dog. The K9 is not an "independent source" in this circumstance—he is an active member of the police team involved that night being deployed only after the officers had already located the evidence.[28]

Moreover, the record indicates that Sergeant McHenry and Officer Lundgren met Dunlap outside the storage facility's locked gate, parking in an external parking lot. From there, Dunlap opened the security gate and they walked straight into the climate-controlled storage building where Collins rented a unit, approaching the building from the east and entering it from one of two doors on that side. They then immediately spotted Collins, Eller, and Clark. Clark's car, however, was parked on the opposite side of the climate-controlled building—the west side— backed up to the building and in a small parking lot between that and another series of storage units. The officers did not pass it on their way into the building, nor was it visible from where their cars were parked. Dunlap knew the car—and at least one other—was on the property, but the record does not indicate that he informed or directed the officers to it—they discovered this only from questioning Clark.

Nothing indicates that the officers were actively searching for Clark or for a rolling meth lab in a car matching his vehicle's description. See Nix, 467 U.S. at 449–50 (inevitable discovery exception applied when State proved that active search parties were approaching

---

[28] This might be a different case if, for example, Sergeant McHenry brought Falco in with him when he entered the storage facility and the K9 independently alerted to the narcotics in Clark's bag prior to the questioning.

location of murder victim's body and would have found it had defendant not led police to it already).  And though Sergeant McHenry believed the neighborhood had a high incidence of drugs, he did not indicate that he was out searching for as-yet-unidentified rolling meth labs when he received the call—and even if he could, Clark's car was in a locked and gated facility to which Sergeant McHenry had no access, and the vehicle was parked in such a location that it would have been blocked from view by trees or buildings even from the roadways around the facility.  In short, the officers had no reason to look for Clark's car, no way to access it or stumble upon it independently, and no way of finding it without Clark's direction.  Accordingly, the record cannot support a finding that the inevitable discovery exception may permit the admission of evidence located in Clark's vehicle.[29]

We therefore are left with the conclusion that Clark's admission to possessing marijuana, the marijuana and other contents of his black bag, and the contents and state of his vehicle, were all fruits of his unlawful detention.  As such, all of this evidence should have been suppressed and it was error to admit it at trial.

## Conclusion

The violation of Clark's Fourth Amendment rights in this case was the direct jumping-off point to the discovery and seizure of all of the substantive evidence used to convict him.

---

[29] Without repeating the analysis in full, we note that it would also apply to the same evidence when it was re-found following execution of the search warrant.

Because none of that evidence should have been admitted at a trial against him, the conviction cannot stand.[30]

The State may of course retry Clark if it can introduce evidence of his guilt that was obtained in a manner not prohibited by the Fourth Amendment. We therefore reverse Clark's conviction for attempted dealing in methamphetamine and remand for proceedings consistent with this opinion.

Dickson, C.J., Rucker and Rush, JJ., concur.
Massa, J., dissents with separate opinion.

---

[30] We therefore do not need to independently address the issue of whether Trooper Shortt's testimony was appropriate but instead summarily affirm that portion of the Court of Appeals opinion. See Clark, 977 N.E.2d at 462–63; Ind. Appellate Rule 58(A)(2).

**Massa, Justice, dissenting.**

The Court's thoughtful and meticulous parsing of the facts and the law, in the end, leaves one overarching question unanswered: what *should* the police have done?

When called at midnight to a 24-hour storage facility in a high-crime area to help the owner evict a customer improperly living in a unit, should they have refused to come? I doubt it. Once there, should they have declined to investigate further and not accompanied the owner from the gate to the unit? Again, I think not. Most critically, once they entered the unit and saw Clark drop his bag, should they have looked the other way and departed?

The breadth of the Court's opinion notwithstanding, the issue essentially boils down to whether the officers had a reasonable and articulable suspicion that justifies their decision to conduct a <u>Terry</u> stop. Once they saw Clark drop his bag, I would conclude they did have such a suspicion, whatever the tone of their ensuing instructions. It was Clark's subsequent admission, as the majority notes, that led to his arrest and all that followed—most of which this Court would approve, had it not found all that fruit poisoned for want of <u>Terry</u> suspicion.

I would affirm the trial court as a unanimous panel of the Court of Appeals did below and thus respectfully dissent.