

**FILED**

Nov 13 2015, 8:51 am

CLERK
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| Brian J. Johnson | Gregory F. Zoeller |
| Danville, Indiana | Attorney General of Indiana |
| | Ian McLean |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeremy Darringer, | November 13, 2015 |
| *Appellant-Defendant*, | Court of Appeals Case No. 32A01-1503-CR-86 |
| v. | Appeal from the Hendricks Superior Court |
| State of Indiana, | The Honorable Stephenie LeMay-Luken, Judge |
| *Appellee-Plaintiff*. | Trial Court Cause No. 32D05-1406-CM-574 |

**Brown, Judge.**

[1] Jeremy Darringer appeals his conviction for operating while intoxicated. Darringer raises one issue which we revise and restate as whether the trial court abused its discretion in admitting certain evidence. We reverse.

## Facts and Procedural History

[2] At approximately 3:10 a.m. on June 27, 2014, Hendricks County Sheriff's Deputy Nathan Hibschman was sitting in his vehicle in a church parking lot observing traffic. Deputy Hibschman saw a vehicle drive east on 100 North, did not see a license plate, and began following the vehicle. He followed the vehicle for approximately one mile at a distance of about forty feet. While following the vehicle, Deputy Hibschman did not witness any traffic infractions and initiated his emergency equipment to stop the vehicle because he believed it did not have a license plate. After turning on his emergency lights which further illuminated the scene, Deputy Hibschman was unable to see a license plate on the vehicle. The vehicle then pulled over.

[3] As he was stopping and about twelve to fifteen feet behind the vehicle, he activated his spotlight, swung it across the vehicle, and saw a paper plate taped in the rear window. He was able to read the letters and numbers on the paper plate after he exited his vehicle and took a couple of steps forward. He then called in the plate as he was approaching the vehicle, observed three occupants inside, and approached the driver's side. Darringer, the driver, rolled down the window, and Deputy Hibschman detected the odor of alcohol coming from the vehicle. Deputy Hibschman said: "Good morning." State's Exhibit 5 at 1:22. Darringer asked Deputy Hibschman how he was doing. *Id.* at 1:24. Deputy

Hibschman then introduced himself and asked Darringer for his license and registration but then stated that Darringer may not have a registration because he had a temporary plate. *Id.* at 1:24-1:35. Darringer explained that the car was brand new. *Id.* at 1:30-1:33.

[4] When Deputy Hibschman was speaking with Darringer through the driver's window, he observed that Darringer had glassy eyes and slurred speech and asked him to step out of the vehicle. Deputy Hibschman still smelled the odor of alcohol after Darringer exited the vehicle. He then patted down Darringer and asked him how much he had to drink, and Darringer said: "Nothing." *Id.* at 2:41. Deputy Hibschman told Darringer that he thought he smelled alcohol on his breath, and Darringer again stated that he did not have anything to drink.

[5] Deputy Hibschman then spoke with the passengers and said that he smelled alcohol in the vehicle. He returned to Darringer and stated:

> The reason I pulled you over is at first I thought you didn't have a license plate because there's nothing down here. It wasn't until I got you stopped that I saw the temporary plate in the window there. So, just for your information and I know you're coming up well you've got a couple of weeks left to go on it, but it's actually illegal to have the temporary plate mounted in the window up there. . . . Even though it is a temporary plate, it does need to be mounted down here where the plates usually go.

*Id.* at 4:47-5:14.

Deputy Hibschman then administered field sobriety tests and still detected the odor of an alcoholic beverage. Darringer failed the horizontal gaze nystagmus test and the walk and turn test. Deputy Hibschman transported Darringer to the Sheriff's Department to perform a breath test. Darringer blew into the Datamaster machine and registered .12 grams of alcohol per 210 liters of breath.

That same day, the State charged Darringer with Count I, operating a vehicle while intoxicated as a class A misdemeanor, and Count II, operating a vehicle with an alcohol concentration equivalent to at least 0.08 grams of alcohol content as a class C misdemeanor.

On February 17, 2015, Darringer filed a motion to suppress. At the hearing, Deputy Hibschman testified that the license plate is "supposed to be mounted down where plates are intended to be mounted." Transcript at 10. The court watched the video recording from Deputy Hibschman's vehicle until the point in time that he exited his vehicle and approached Darringer's vehicle.

Defense counsel argued there were no grounds for the initial stop because the placement of the plate in the window was proper under Ind. Code § 9-32-6-11. He also argued: "I think it's clear from the video that you can see there's something in the corner. The Deputy wasn't even looking at that because at the time he was under the impression, incorrectly, that this plate had to be on the bumper." *Id.* at 57-58. The prosecutor conceded that it was no longer the case that an individual could not display a temporary license plate in the back

window and that Deputy Hibschman was mistaken in his belief that the plate needed to be on the bumper, but argued that the license plate was not visible at all as required by the statute.

[10] The court denied Darringer's motion and stated:

> With regards to the stop and detention and the arrest overall, I'm denying the Motion to Suppress and Motion in Limine based on the fact that the officer stated and I watched this video, the officer did not call in the numbers on the temporary tag or paper plate or interim license plate, whatever you want to call it, until he was already approaching the vehicle. The statute says it must be clearly visible. . . . Well, in the majority of the parts of Hendricks County, it may be clearly visible at noon, but in Hendricks County and frankly across the State of Indiana, it doesn't mean it's going to be clearly visible at midnight and that is, it's supposed to be clearly visible. And so, therefore, there is no other choice that a police officer has, if you're trying to find a license plate, police officers are used to through [sic], on the whole back of the vehicle. There's no testimony that he only looked at the license plate when looking at this vehicle, he would have had to look on more than the license plate area, which is the bumper that has the lights in order to identify the make and model. If he was only was [sic] looking at the license plate bumper in the middle of the bumper where a license plate is normally attached, a metal license plate or interim license plate, he would not know anything else about the vehicle. So, therefore, I find that the stop was appropriate because the plate was not clearly visible even though it was in the proper place in the back of the window.

*Id.* at 71-72. On February 19, 2015, Darringer filed a motion to reconsider the court's order denying his motion to suppress, and the court denied the motion.

On February 24, 2015, a jury trial was held. During Deputy Hibschman's testimony, defense counsel stated: "[W]e would just make an objection to the traffic stop based on the testimony today." *Id.* at 173. Defense counsel asked the court to incorporate the hearing, arguments and brief, and objected "based on the lack of a traffic infraction that it's a violation of the Fourth Amendment to the U.S. Constitution and obviously Article One, Section Eleven of the Indiana Constitution." *Id.* The court overruled the objection and "ke[pt] [its] order denying the Motion to Suppress in effect." *Id.* at 173-174. During direct examination, Deputy Hibschman testified that he initially observed that the vehicle did not appear to have any license plate, that when he said the vehicle did not have a license plate he was referring to the bumper, that he did not see a license plate anywhere on Darringer's car, that he did not look in the rear window, that he did not look anywhere else other than the bumper, and that he first saw the license plate after he had initiated the traffic stop and activated his spotlight. Deputy Hibschman testified that his statements to Darringer that a temporary plate had to be mounted on the bumper where plates usually are placed was in fact incorrect but that he believed it at the time.

The court admitted the BAC DataMasters Evidence Ticket indicating a result of .12 and Deputy Hibschman's testimony that the .12 was based on grams of alcohol per 210 liters of breath. On cross-examination, Deputy Hibschman testified that after July 1, 2013, people were legally allowed to drive a vehicle with a paper plate in the left rear window. Sheila Arnold, a forensic toxicologist employed by the Indiana State Department of Toxicology, testified

that her opinion was that Darringer was intoxicated and impaired on June 27, 2014.

[13] After the prosecutor rested, defense counsel moved for a directed verdict on Count I, operating a vehicle while intoxicated. The court denied the motion. The jury found Darringer guilty as charged. The court entered judgment of conviction on Count I, operating a vehicle while intoxicated as a class A misdemeanor, and sentenced Darringer to 180 days in the Hendricks County Jail with 178 days suspended to probation.

## *Discussion*

[14] The issue is whether the court abused its discretion by admitting the evidence obtained after the traffic stop. Darringer contends that the State failed to prove that the stop was based upon reasonable suspicion that Darringer committed a traffic violation or that Deputy Hibschman made an objectively reasonable mistake of fact or law justifying the stop of Darringer's car. He argues that his interim license plate was properly displayed under the version of Ind. Code § 9-32-6-11 in effect at the time of the stop, which permitted an interim plate to be displayed in the rear window. He notes that there is no dispute that Deputy Hibschman was unaware that Indiana law had changed to allow for the interim plate to be displayed in the rear window of a vehicle for almost a year before the stop, and contends that Deputy Hibschman's mistake of law cannot be said to be objectively reasonable because it was not premised upon a reasonable interpretation of an existing statute. Darringer also argues that while Deputy Hibschman testified at one point that he did not see the license plate on the

vehicle, he was fixated on the bumper and did not look in the rear window, and that while it is possible that he may not have been able to see the interim plate without shining his spotlight onto the rear window, there is nothing in the record to support why he could not have done so without initiating a traffic stop.

[15] The State argues that Deputy Hibschman repeatedly testified that he did not see a plate on Darringer's vehicle and only saw the plate after he had already exited his vehicle and that the video recording does not contradict his testimony. The State asserts that the facts were sufficient to justify a reasonable officer's decision to stop Darringer's vehicle and that Darringer is asking this court to reweigh the evidence. The State also contends that the record does not support Darringer's inference that Deputy Hibschman was fixated on the bumper to the point of disregarding any other fact, and that there is evidence supporting the trial court's decision that his on-the-spot evaluation would reasonably suggest that Darringer's plate was not clearly visible as required by statute. The State asserts that it is unnecessary for this court to apply *Heien v. North Carolina*, 135 S. Ct. 530 (2014), cited by Darringer, which discussed an officer's mistake of law, because a plate must be clearly visible under Indiana statutory law.

[16] We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will

not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. Also, we may affirm a trial court's decision to admit evidence seized as a result of a search based on any legal theory supported by the record. *Edwards v. State*, 724 N.E.2d 616, 620-621 (Ind. Ct. App. 2000), *trans. denied*. We review *de novo* a ruling on the constitutionality of a search or seizure, but we give deference to a trial court's determination of the facts, which will not be overturned unless clearly erroneous. *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008); *see also Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (holding that the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider *de novo*).

[17] In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter*, 18 N.E.3d at 1001. If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014). It also considers the evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. *Carpenter*, 18 N.E.3d at 1001.

[18] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[19] A law enforcement officer must have reasonable suspicion of criminal conduct in order to justify a traffic stop, which is a "seizure" for purposes of the Fourth Amendment. *Clarke v. State*, 868 N.E.2d 1114, 1118 (Ind. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)). When determining whether an officer had reasonable suspicion for a *Terry* stop, we consider whether the totality of the circumstances presented a particularized and objective basis for the officer's belief that the subject was engaged in criminal activity. *State v. Keck*, 4 N.E.3d 1180, 1184 (Ind. 2014). In assessing the whole picture, we must examine the facts as known to the officer at the moment of the stop. *Clark v. State*, 994 N.E.2d 252, 264 (Ind. 2013). We review findings of reasonable suspicion *de novo*. *Id.* This is necessarily a fact-sensitive inquiry. *Id.*

[20] We will briefly discuss the law prior to the adoption of Ind. Code § 9-32-6-11 in 2013. In *Merritt v. State*, 829 N.E.2d 472, 473-476 (Ind. 2005), the Indiana Supreme Court considered whether placing a license plate in a vehicle's rear window contravened Indiana's statutes then governing the proper display and illumination of plates. The Court examined Ind. Code § 9-18-2-26(b), which at the relevant time provided:

A license plate shall be securely fastened, in a horizontal position, to the vehicle for which the plate is issued:

(1) To prevent the license plate from swinging;

(2) At a height of at least twelve (12) inches from the ground, measuring from the bottom of the license plate;

(3) In a place and position that are clearly visible;

(4) Maintained free from foreign materials and in a condition to be clearly legible; and

(5) Not obstructed or obscured by tires, bumpers, accessories, or other opaque objects.

829 N.E.2d at 474. The Court also examined Ind. Code § 9-19-6-4(e), which required illumination of license plates.[1] *Id.* The Court found these provisions interacted to "require that the license plate be displayed upon the rear of the vehicle, securely fastened, in a horizontal position, and also be illuminated at night by a separate white light so as to be clearly legible from fifty feet." *Id.* at 476. The Court concluded that because "the defendant's license plate inserted inside the back window of his automobile was not displayed appropriately, . . . the officer's stop was proper, and . . . the trial court did not err in admitting evidence resulting from the stop." *Id.* at 475.

---

[1] At the time of the offense in *Merritt* and the present offense, Ind. Code § 9-19-6-4(e) provided:

Either a tail lamp or a separate lamp must be placed and constructed so as to illuminate the rear registration plate with a white light and make the plate clearly legible from a distance of fifty (50) feet to the rear. A tail lamp or tail lamps, together with a separate lamp for illuminating the rear registration plate, must be wired so as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

In *Meredith v. State*, 906 N.E.2d 867, 871 (Ind. 2009), the Indiana Supreme Court discussed the display and illumination of plates before a vehicle is permanently registered. The Court held that the statute for interim license plates, Ind. Code § 9-18-26-10,[2] failed to alter or amend the required placement and display of license plates set forth in Ind. Code §§ 9-18-2-26 and 9-19-6-4(e). 906 N.E.2d at 872. The Court observed that Ind. Code § 9-18-2-26 governed the display of "license plates" without discriminating between interim and regular plates. *Id.* The Court also observed that Ind. Code § 9-19-6-4(e) required that all "registration plate[s]" be illuminated so as to be visible from a distance of fifty feet. *Id.* The Court held:

> As explained in *Merritt*, these provisions "require that the license plate be displayed upon the rear of the vehicle, securely fastened, in a horizontal position, and also be illuminated at night by a

---

[2] At the time of the alleged offense in *Meredith*, Ind. Code § 9-18-26-10 provided:

(a) The bureau may issue an interim license plate to a dealer or manufacturer who is licensed and has been issued a license plate under section 1 [IC 9-18-26-1] of this chapter.

(b) The bureau shall prescribe the form of an interim license plate issued under this section. However, a plate must bear the assigned registration number and provide sufficient space for the expiration date as provided in subsection (c).

(c) Whenever a dealer or manufacturer sells a motor vehicle, the dealer or manufacturer may provide the buyer with an interim license plate. The dealer shall, in the manner provided by the secretary of state, affix on the plate in numerals and letters at least three (3) inches high the date on which the interim license plate expires.

(d) An interim license plate authorizes a motor vehicle owner to operate the vehicle for a maximum period of thirty-one (31) days after the date of delivery of the vehicle to the vehicle's owner or until a regular license plate is issued, whichever occurs first.

(e) A motor vehicle that is required by law to display license plates on the front and rear of the vehicle is only required to display a single interim plate.

(Repealed by Pub. L. No. 92-2013, § 46 (eff. July 1, 2013)).

separate white light so as to be clearly legible from fifty feet." 829 N.E.2d at 476. Placing "a license plate on the *inside* of the back window clearly does not satisfy the requirement that license plates be displayed '*upon* the rear of the vehicle.'" *Id.* at 475. Likewise, the defendant's license plate was not illuminated by a separate white light so that it was clearly legible from fifty feet. Officer Lackey was therefore justified in stopping the defendant.

*Id.* The Court concluded:

> [A]s neither the statutes nor regulations differentiate between the display requirements for a permanent and interim plate, the interim plate must be mounted in the same fashion as the permanent plate. Any other method of display may give rise to reasonable suspicion for law enforcement officers to initiate a traffic stop to ascertain whether the display complies with all statutory requirements.

> As to this defendant, Officer Lackey had, by virtue of the interim plate being both unilluminated and placed incorrectly, reasonable suspicion to pull over the defendant's vehicle for a traffic stop. Thus, the initial stop due to the suspected license plate display violation was proper and the trial court did not err in refusing to suppress the resulting evidence on this basis.

*Id.* at 873.

[22] Effective July 1, 2013, the legislature amended Ind. Code § 9-18-2-26 to provide that "(a) License plates, including temporary license plates, shall be displayed as follows . . . (3) For every other vehicle, upon the rear of the vehicle" and "(c) [a]n interim license plate must be displayed in the manner required by IC 9-32-

6-11(f)." The legislature also added Ind. Code § 9-32-6-11, titled "Interim plates," effective July 1, 2013, and subsection (f) provided in part:

> An interim license plate[3] shall be displayed: (1) in the same manner required in IC 9-18-2-26; *or (2) in a location on the left side of a window facing the rear of the motor vehicle that is clearly visible and unobstructed. The plate must be affixed to the window of the motor vehicle.*

(Emphasis added).

[23] Upon the adoption of Ind. Code § 9-32-6-11, the legislature altered the required placement and display of interim plates set forth in Ind. Code §§ 9-18-2-26 and 9-19-6-4(e). The State does not dispute on appeal that Darringer's plate was an interim plate. For almost one year prior to the stop in this case, the statute as amended allowed for an interim license plate to be displayed on the left side of the rear window of Darringer's vehicle. Accordingly, we conclude that Deputy Hibschman stopped Darringer's vehicle based upon an unreasonable mistake of law.

[24] In *Heien v. North Carolina*, 135 S. Ct. 530, 534 (2014), the United States Supreme Court addressed whether a police officer's mistake of law can give rise to the reasonable suspicion necessary to uphold a seizure under the Fourth

---

[3] Ind. Code § 9-32-6-11(c) provides that "[w]henever a dealer or manufacturer sells or leases a motor vehicle, the dealer or manufacturer may provide the buyer or lessee with an interim license plate." Ind. Code § 9-32-6-11(d) provides that "[a]n interim license plate authorizes a motor vehicle owner or lessor to operate the vehicle for a maximum period of thirty-one (31) days after the date of sale or lease of the vehicle to the vehicle's owner or lessor or until a regular license plate is issued, whichever occurs first."

Amendment. In that case, a police officer initiated a traffic stop after observing only the left brake light illuminate when a vehicle braked. 135 S. Ct. at 534. Nicholas Brady Heien, a passenger of the stopped vehicle, consented to a search, and police discovered cocaine. *Id.* The State charged Heien with attempted trafficking of cocaine. *Id.* at 535. Heien moved to suppress the evidence seized from the car, contending that the stop and search had violated the Fourth Amendment of the United States Constitution. *Id.* The trial court denied the suppression motion. *Id.* Heien pled guilty but reserved the right to appeal the suppression decision. *Id.*

[25] The relevant provision of the vehicle code in *Heien* provided that a car must be:

> equipped with a stop lamp on the rear of the vehicle. The stop lamp shall display a red or amber light visible from a distance of not less than 100 feet to the rear in normal sunlight, and shall be actuated upon application of the service (foot) brake. The stop lamp may be incorporated into a unit with one or more other rear lamps.

*Id.* at 535 (quoting N.C. Gen. Stat. Ann. § 20-129(g) (2007)). The North Carolina Court of Appeals reversed and held that the initial stop was not valid because driving with only one working brake light was not actually a violation of North Carolina law. *Id.* (citing 214 N.C. App. 515, 714 S.E.2d 827 (2011)).

[26] The State of North Carolina appealed, and the North Carolina Supreme Court reversed. *Id.* (citing 366 N.C. 271, 737 S.E.2d 351). Noting that the State had chosen not to seek review of the Court of Appeals' interpretation of the vehicle code, the North Carolina Supreme Court assumed for purposes of its decision

that the faulty brake light was not a violation. *Id.* The court concluded that, for several reasons, the police officer could have reasonably, even if mistakenly, read the vehicle code to require that both brake lights be in good working order. *Id.* The North Carolina Supreme Court noted that a nearby code provision required that all originally equipped rear lamps be functional. *Id.* (citing 366 N.C. at 282-283, 737 S.E.2d at 358-359).

[27] The United States Supreme Court observed that the ultimate touchstone of the Fourth Amendment is reasonableness. *Id.* at 536. "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S. Ct. 1302 (1949)). The Court observed that searches and seizures based on mistakes of fact can be reasonable and held:

> But reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

*Id.* The Court also held:

Heien also contends that the reasons the Fourth Amendment allows some errors of fact do not extend to errors of law. Officers in the field must make factual assessments on the fly, Heien notes, and so deserve a margin of error. In Heien's view, no such margin is appropriate for questions of law: The statute here either requires one working brake light or two, and the answer does not turn on anything "an officer might suddenly confront in the field." Brief for Petitioner 21. But Heien's point does not consider the reality that an officer may "suddenly confront" a situation in the field as to which the application of a statute is unclear—however clear it may later become. A law prohibiting "vehicles" in the park either covers Segways or not, see A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 36-38 (2012), but an officer will nevertheless have to make a quick decision on the law the first time one whizzes by.

Contrary to the suggestion of Heien and *amici*, our decision does not discourage officers from learning the law. The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. *Cf. Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996). And the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce.

*Id.* at 539-540. In applying the test of whether the mistake of law was reasonable to the facts, the Court stated:

Here we have little difficulty concluding that the officer's error of law was reasonable. Although the North Carolina statute at issue refers to "*a* stop lamp," suggesting the need for only a single

working brake light, it also provides that "[t]he stop lamp may be incorporated into a unit with one or more *other* rear lamps." N.C. Gen. Stat. Ann. § 20-129(g) (emphasis added). The use of "other" suggests to the everyday reader of English that a "stop lamp" is a type of "rear lamp." And another subsection of the same provision requires that vehicles "have all originally equipped rear lamps or the equivalent in good working order," § 20-129(d), arguably indicating that if a vehicle has multiple "stop lamp[s]," all must be functional.

The North Carolina Court of Appeals concluded that the "rear lamps" discussed in subsection (d) do not include brake lights, but, given the "other," it would at least have been reasonable to think they did. Both the majority and the dissent in the North Carolina Supreme Court so concluded, and we agree. *See* 366 N.C., at 282-283, 737 S.E.2d, at 358-359; *id.*, at 283, 737 S.E.2d, at 359 (Hudson, J., dissenting) (calling the Court of Appeals' decision "surprising"). This "stop lamp" provision, moreover, had never been previously construed by North Carolina's appellate courts. *See id.*, at 283, 737 S.E.2d, at 359 (majority opinion). It was thus objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop.

*Id.* at 540.

[28]   The facts in *Heien* are clearly distinguishable from those present here. As noted, the legislature added Ind. Code § 9-32-6-11, titled "Interim plates," which allowed an interim plate to be placed "in a location on the left side of a window facing the rear of the motor vehicle that is clearly visible and unobstructed" so that for almost one year prior to the stop, an interim license plate could be

displayed on the left side of a window facing the rear of the motor vehicle. Unlike in *Heien*, which dealt with a statute referring to "a stop lamp" suggesting the need for only a single working brake light, another portion of the statute referring to "other rear lamps," and yet another subsection requiring that vehicles "have all originally equipped rear lamps or the equivalent in good working order," Ind. Code § 9-32-6-11(f) explicitly allows an interim plate to be displayed "in a location on the left side of a window facing the rear of the motor vehicle that is clearly visible and unobstructed" and that "[t]he plate must be affixed to the window of the motor vehicle." The evidence was that the plate was an interim plate,[4] the prosecutor conceded that the relevant statute was Ind. Code § 9-32-6-11, and the State does not contend on appeal that the plate in Darringer's window was any type other than an interim plate. Under the circumstances, we cannot say that the reason for stopping the vehicle based upon the failure to mount the interim plate on the bumper was a reasonable mistake of law.

[29] To the extent that the State asserts that the stop was proper because the plate was not clearly visible, we acknowledge that "if a police officer makes a temporary detention on one basis, later determined to be insufficient, the stop may be upheld on another basis shown by the facts known to the officer." WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH

---

[4] Deputy Hibschman testified at trial that Darringer would not have a registration based upon his plate. This testimony indicates that Darringer had an interim plate, which is one that is provided by a dealer to a purchaser or lessee of a vehicle. *See* Ind. Code § 9-32-6-11(c) and (d).

AMENDMENT 157 n.30 (5th ed. 2012). However, the critical component is whether the facts supplying a separate basis were *known* to the officer. *See Clark*, 994 N.E.2d at 264 ("In assessing the whole picture, we must examine the facts as known to the officer at the moment of the stop."); *Campos*, 885 N.E.2d at 597 ("Reasonable suspicion exists where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur." (quoting *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind. 1999))).

[30]  The record reveals that Deputy Hibschman specifically testified that he did not look in the rear window or anywhere else on the vehicle other than the bumper. Specifically, the following exchange occurred during the direct examination of Deputy Hibschman:

> Q  And what attracted your attention to [the vehicle]?
>
> A  When the vehicle passed I initially observed that the vehicle did not appear to have any license plate.
>
> Q  Did this peak your interest at all?
>
> A  It did.
>
> Q  Why?
>
> A  Because vehicles are required to have a registration.
>
> Q  By registration, do you mean license plate?
>
> A  Yes, I do.
>
> Q  Now, when you say that the vehicle didn't have a license plate, are you referring to the bumper?

A Yes.

Q Was there a license plate anywhere else in that vehicle?

A I later found out that there was.

Q Well, let's say when you're in the Lutheran Church parking lot, you saw the car, did you see a license plate on Mr. Darringer's car?

A I could not.

Q Anywhere?

A No.

Q Not in the windshield?

A No.

Q Not on the side?

A No.

Q So what did you do?

A Uh, at that point, I pulled out from the parking lot and begin following the vehicle? [sic]

Q And how long did you follow the vehicle?

A Approximately one (1) mile.

Q About what distance do you follow Mr. Darringer's vehicle?

A Since, I didn't see a plate, there was no need to get close enough to try and get the license plate numbers, so I hung back approximately three (3) to four (4) car lengths I would estimate it at probably forty (40) feet or more.

Q  During this mile that you followed Mr. Darringer's vehicle, did you ever see a license plate?

A  I did not.

Q  Did you look on the bumper?

A  I did.

Q  Did you look in the rear window?

A  I didn't.

Q  You did not?

A  I didn't.

Q  Did you look anywhere else other than the bumper?

A  I did not.

Q  And so, you mentioned you did see a license plate at some point. When was the first point you saw the license plate?

A  Just after we had crossed over Ronald Reagan Parkway, we were just east of Ronald Reagan Parkway when I had initiated the traffic stop, um, when I had activated my spot light and shone it up on the vehicle, I did catch the, uh, white temporary plate that was taped in the rear window.

Transcript at 166-168.

[31]    While Deputy Hibschman testified that he did not see a plate on the vehicle, he also repeatedly stated that he did not look in the rear window and did not look anywhere else other than the bumper. Accordingly, we cannot say that the facts known to Deputy Hibschman would have otherwise provided a basis for the stop based upon the idea that the interim plate in the rear window was not clearly visible, where Deputy Hibschman specifically testified that he did not

look in the rear window. Under the circumstances, we conclude that the trial court abused its discretion when it admitted evidence obtained pursuant to an illegal traffic stop. Accordingly, we reverse Darringer's conviction for operating while intoxicated as a class A misdemeanor.[5] *See Kroft v. State*, 992 N.E.2d 818, 822 (Ind. Ct. App. 2013) (observing that an officer testified that he pulled over the defendant simply because there was white light coming out of a tiny hole and that he did not testify that he had trouble spotting the defendant's vehicle from behind, holding that the officer did not have reasonable suspicion to stop the defendant pursuant to Ind. Code § 9-21-7-1 which required that a vehicle be in good working order and not endanger others, and reversing the trial court's denial of the defendant's motion to suppress); *Killebrew v. State*, 976 N.E.2d 775, 783 (Ind. Ct. App. 2012) (concluding that the trial court abused its discretion when it admitted evidence obtained pursuant to an illegal traffic stop and reversing the defendant's conviction for possession of marijuana as a class A misdemeanor), *reh'g denied*, *trans. denied*.

## Conclusion

[32] For the foregoing reasons, we reverse Darringer's conviction for operating a vehicle while intoxicated as a class A misdemeanor.

---

[5] Because we reverse Darringer's conviction on the basis that he was subjected to an unreasonable search under the Fourth Amendment, we do not reach Darringer's claim that the seizure was unreasonable under Article 1, Section 11 of the Indiana Constitution. *See Reinhart v. State*, 930 N.E.2d 42, 45 n.1 (Ind. Ct. App. 2010).

Reversed.

Altice, J., concurs.

Riley, J., concurs in result without opinion.