## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 20 2020, 8:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Derick W. Steele
Raquet, Vandenbosch & Steele
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Marcus Byars, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff,* | February 20, 2020 <br><br> Court of Appeals Case No. 19A-CR-368 <br><br> Appeal from the Howard Circuit Court <br><br> The Honorable Lynn Murray, Judge <br><br> Trial Court Cause No. 34C01-1705-MR-112 |

**Robb, Judge.**

# Case Summary and Issue

[1] Following a jury trial, Marcus Byars was convicted of felony murder, and sentenced to serve sixty-five years in the Indiana Department of Correction ("DOC"), with three years suspended to probation. Byars appeals and raises one issue for our review: whether the trial court abused its discretion in admitting evidence discovered in Byars' trailer pursuant to a search warrant. Concluding the trial court did not abuse its discretion, we affirm.

# Facts and Procedural History

[2] The facts most favorable to the verdict are as follows. Byars and Jason Heck had known each other for years. On the night of May 21 and early morning of May 22, 2017, Byars was out drinking with friends. When he returned to his uncle's trailer later that night, he called Heck, who was in bed with his girlfriend, Natasha King, at their house. Byars asked "if [Heck] would trade [him] some Xanax for some marijuana." Transcript of Evidence, Volume III at 194. The two discussed an incident that occurred around Mother's Day, in which Byars had been robbed. Heck offered to sell Byars a pistol, and Byars agreed to purchase it. Because Byars had been drinking, he asked Heck to come to his trailer for the exchange and Heck agreed. Heck got out of bed and told King he was going to the Chrysler parking lot to "[h]old up somebody for two grand." Tr., Vol. II at 135. Heck left with an AirsoftBB gun pistol that he had covered with black electrical tape to make it appear real.

[3] Heck arrived at Byars' trailer and parked his car across the street from the trailer. Heck and Byars inspected the pistol; Byars wanted to test the gun "to make sure it worked." Tr., Vol. III at 195. Heck then drove the two of them in Byars' truck to the UAW Hall. When they arrived at the UAW Hall, the two exited Byars' truck, and Byars shot Heck with the gun. After shooting Heck, Byars drove his truck to the trailer and told his uncle what had happened. Byars then returned to the UAW Hall where he recovered the gun and took Heck's keys, cigarettes, and cell phone before going back to his uncle's trailer. Byars "tried to get [his] uncle to follow [him] to go take [Heck's] car back to where he was, but [his uncle] wouldn't do it[.]" *Id*. at 198.

[4] After his uncle refused, Byars went to his friend April's house and solicited her help in moving Heck's car. The two of them took Heck's car to the Chrysler parking lot, located a short distance from where Byars had shot Heck, and left it. Eventually, Byars and April returned to the trailer and went to sleep. After lying down for some time, Byars got some flour, put it in a bag, returned to the UAW Hall, and placed the bag of flour near Heck's body in an attempt to make it "look like a drug deal gone bad or a robbery committed during a drug deal[.]" *Id*. at 204-05. Hours later, Byars went to work and discussed what had happened with "anybody that would listen to the situation." *Id*. at 199. Also that morning, Byars contacted his lifelong friend, Stephanie Cross, and stated that he needed to speak with her about "something [that] was . . . bothering him[.]" Tr., Vol. II at 197. Byars came to Cross' house, the two conversed on

the porch, and Byars told Cross that he had shot someone. Byars left but the two agreed to meet up later that day.

[5] Around 12:00 or 1:00 p.m., Cross went to Byars' trailer where Byars revealed additional details to Cross. Specifically, Byars disclosed that he had been with friends earlier in the night; he later shot someone in the face; there was a shell casing and he picked it up; he drove the victim's car to a Chrysler plant; he later returned to the scene and took the victim's cell phone and broke it into pieces; he also placed a "white powder substance" near the victim to make it look like a drug deal; and he gave the gun to another person. *See id.* at 200-01. Byars then discussed formulating an alibi with Cross – framing someone he did not like.

[6] Around 4:14 p.m., officers of the Kokomo Police Department ("KPD") responded to a report of an "unconscious, unresponsive" male at the Local 1166 Union Hall in Kokomo, Indiana. *Id.* at 91. Upon arrival, officers observed a man's body underneath a covered recreational area; he was facedown with dried blood around his head, his pants were pulled down, and his pockets were turned inside out. The victim was later identified as Heck.[1] At the scene, officers located two spent .9 mm shell casings, a piece of plastic believed to be part of a phone, and footprints leading from the body toward the parking lot. Underneath Heck's body, officers discovered "what appear[ed] to

---

[1] Initially, officers were able to identify Heck through his tattoo and jail records.

be a piece of glass to a smartphone, the covering," and a plastic baggie containing a white powdery substance. *Id*. at 96.

[7] The same day, KPD Detective Brent Wines spoke with Heck's parents, who confirmed Heck's cell phone number and that he owned a 2009 Pontiac G6. Officers then obtained a search warrant for Heck's cell phone records. The next day, May 23, officers located Heck's car in the lot of the Chrysler plant, just north of the crime scene, and confirmed the vehicle they located was registered to Heck. Officers also obtained the surveillance footage of the parking lot where Heck's car was found. The footage illustrated the following: Heck's car pulled into the parking lot at 2:42 a.m. on May 22; a red colored car then pulled up to Heck's car; a person got out of Heck's car and into the red car; the red car drove away; and Heck's car remained parked in the lot where officers found it. The same day, officers received the autopsy report, which revealed Heck's cause of death as a gunshot wound to the head. Specifically, the bullet entered just above Heck's right eyebrow. Officers then interviewed King, who stated that she was with Heck the night before when he got a phone call; Heck told King that he and the caller planned to rob someone; and he subsequently left the house with an airsoft gun.

[8] On May 24, officers received Heck's cell phone records. The records indicated that Heck received a phone call from a number later determined to be Byars' at 1:01 a.m., 1:22 a.m., and 1:36 a.m. on May 22; the duration of the calls were 398, 295, and 25 seconds respectively. *See* Exhibit, Volume I at 62. At 1:37 a.m., Heck received a text message from Byars and several minutes later, called

Byars back, a call which lasted 186 seconds. *See id*. On May 25, officers interviewed Cross, who provided Byars' cell phone number and stated that Byars stayed at three different locations and had three vehicles, including a red Chevy Camaro. Cross told investigators that Byars told her he shot someone in the face, left the victim's car at Chrysler, and took the victim's cellphone and broke it into pieces. She further stated that Byars told her he took something from the scene but also left something, and that he hid the gun at a friend's house.

[9] Following the interview, investigators confirmed that Byars owned a red 1998 Chevrolet Camaro and located said vehicle outside of Byars' grandfather's house – one of the addresses provided by Cross. Officer Michael Banush submitted a probable cause affidavit outlining all of this information in his application for a search warrant for Byars' trailer. The trial court issued the warrant and officers executed it shortly thereafter. During the search, officers seized (among other items) a pair of boots, three empty Boost Mobile cell phone boxes and a receipt, $3,090 in cash, and a plastic bag containing three Xanax pills.

[10] On May 26, 2017, the State charged Byars with murder; the State later filed the additional charge of felony murder for knowingly or intentionally killing Heck while committing or attempting to commit robbery. *See* Appellant's Appendix, Volume 2 at 15, 25. On July 31, 2018, Byars filed a motion to suppress all evidence seized during the execution of the search warrant of his trailer. Following a suppression hearing on August 14, the trial court denied the

motion. A jury trial was held on December 10-13, 2018. At trial, Byars renewed his objection to the evidence discovered during the execution of the search warrant at his home. *See* Tr., Vol. II at 178. The jury found Byars guilty of reckless homicide, as a lesser included offense of murder, and felony murder. The trial court entered judgment of conviction for felony murder and vacated Byars' reckless homicide conviction due to double jeopardy concerns. The trial court sentenced Byars to serve sixty-five years in the DOC, with three years suspended to probation. Byars now appeals.

# Discussion and Decision

## I. Standard of Review

[11] Byars presents his issue as challenging the denial of a motion to suppress; however, his case proceeded to trial where he renewed his objection to the admission of this evidence.

> In such an instance the question of whether the trial court erred in denying a motion to suppress is no longer viable. A ruling on a pretrial motion to suppress is not intended to serve as the final expression concerning admissibility. Direct review of the denial of a motion to suppress is only proper when the defendant files an interlocutory appeal.

*Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013) (internal quotations and citations omitted). In this case, the issue on appeal is best framed as a challenge to the admission of evidence and we review it as such.

Our standard of review in this area is well-settled:  the admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the trial court's decision for an abuse of that discretion.  *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*.  An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it.  *Morrison v. State*, 824 N.E.2d 734, 739 (Ind. Ct. App. 2005), *trans. denied*.  We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Strickland v. State*, 119 N.E.3d 140, 146 (Ind. Ct. App. 2019), *trans. denied*. However, we must also consider the uncontested evidence favorable to the defendant.  *Id*.

## II.  Admission of Evidence:  Validity of Warrant

Byars challenges the validity of the warrant authorizing police to search his trailer.  Specifically, he argues there was insufficient evidence in the affidavit to establish probable cause because the affidavit contained uncorroborated hearsay, namely Cross' statements implicating Byars in Heck's murder.  We disagree.

Although a trial court's determination of facts is entitled to deferential review, we employ a de novo standard when reviewing the trial court's ultimate determination of reasonable suspicion and probable cause.  *Johnson v. State*, 992 N.E.2d 955, 957 (Ind. Ct. App. 2013), *trans. denied*.  "In other words, when a trial court has admitted evidence alleged to have been discovered as the result of

an illegal search or seizure, we generally will assume the trial court accepted the evidence presented by the State and will not reweigh that evidence, but we owe no deference as to whether that evidence established the constitutionality of a search or seizure." *Id.*

[15] The Fourth Amendment to the United States Constitution and Article 1, section 11 of the Indiana Constitution both require probable cause for the issuance of a search warrant. *Rader v. State*, 932 N.E.2d 755, 758 (Ind. Ct. App. 2010), *trans. denied*. "Probable cause is a fluid concept incapable of precise definition and must be decided based on the facts of each case." *Id.* "Ultimately, the task of a magistrate in deciding whether to issue a search warrant is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *McGrath v. State*, 95 N.E.3d 522, 528 (Ind. 2018) (internal quotation omitted). When reviewing a magistrate's decision to issue a warrant, we apply a deferential standard. *Newby v. State*, 701 N.E.2d 593, 598 (Ind. Ct. App. 1998). We evaluate whether the reasonable inferences drawn from the totality of the evidence support the probable cause finding. *McGrath*, 95 N.E.3d at 528. "Rather than consider *post hoc* justifications for the search, we evaluate only the evidence presented to the issuing magistrate." *Id.*

[16] The United States Supreme Court has held that uncorroborated hearsay from a source whose credibility is itself unknown, standing alone, cannot support a finding of probable cause to issue a search warrant. *Newby*, 701 N.E.2d at 598.

"The hearsay must exhibit some hallmarks of reliability." *Jaggers v. State*, 687 N.E.2d 180, 182 (Ind. 1997). The reliability of hearsay for purposes of proving probable cause can be established in a number of ways, including where:

> (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activities by the suspect that are not ordinarily easily predicted.

*Newby*, 701 N.E.2d at 598. And "[d]epending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay." *Scott v. State*, 883 N.E.2d 147, 154 (Ind. Ct. App. 2008).

[17] Pursuant to Indiana Code section 35-33-5-2(b), the General Assembly's codification of the Fourth Amendment doctrine pertaining to the use of informants to establish probable cause, when statements contained in an affidavit are based on hearsay, the affidavit must either: (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay. *State v. Mason*, 829 N.E.2d 1010, 1017 (Ind. Ct. App. 2005).[2]

---

[2] Byars does not advance a separate and distinct argument under the Indiana Constitution and therefore, any such argument is considered waived. *Myers v. State*, 839 N.E.2d 1154, 1158 (Ind. 2005), *cert. denied*, 547 U.S. 1148 (2006).

[18]     Byars contends the information provided by Cross is merely uncorroborated hearsay. We are unpersuaded and conclude that the totality of the evidence corroborates Cross' statements.

[19]     Cross provided information to investigators implicating Byars in Heck's murder, which was incorporated into the probable cause affidavit as follows:

>    On 5/25/17 at 12:34 am investigators interviewed Stephanie E. Cross. Stephanie advised that at approximately 10:04 am on 5/24/17, she received a phone call from [Byars]. She provided Byars' cellphone number[.] According to Stephanie, Byars told her that he needed to talk with her about something important but could not talk on the telephone. Stephanie told investigators that he arrived at her residence . . . a short time later. While at her house, Byars told her that he shot a guy in the face. Byars then told Stephanie that he did not want to speak there and wanted to meet with her at his trailer which she agreed to do. Byars left while Stephanie got ready. Stephanie advised that Byars was on his yellow/black motorcycle. She arrived at Byars' trailer [and] stated that it was only Byars and herself at the trailer. Stephanie stated to investigators that Byars told her that a few days ago, he saw a man that he knows who owed him some money. He and the man went to the trailer and played video games. Stephanie stated that she believed that those present in the trailer was [sic] Byars, Byars' girlfriend, April M. Williams and the victim. Byars told her at some point that day after playing video games, he shot the victim in the face one (1) time. He did not tell her the location of the incident. Byars then told Stephanie that he "ditched" the victim's car at Chrysler. He also stated . . . that he took the victim's cellphone and busted it into pieces. According to Stephanie, Byars told her that he threw the phone pieces out of the car window while traveling back to his trailer. He advised Stephanie that the battery is in someone's yard that lives in the trailer park. Byars asked Stephanie if he should retrieve the piece and throw it away someplace else.

Stephanie told investigators that she did not know which Chrysler plant the victim's car was left at. She advised that Byars told her that he was driving his red Chevy Camaro at the time of the shooting. Stephanie informed investigators that Byars told her that he picked something up at the murder scene; but also left something. She thought he may have told her that he picked up the shell casing; but she was not certain. Stephanie stated that Byars told her he hid the gun at a friend's house.

According to Stephanie, Byars stays at three residences [one of which is his uncle's trailer]. She also knows him to drive three vehicles: a red Chevrolet Camaro, a yellow/black motorcycle and a black SUV.

Appellant's App., Vol. 2 at 110-11. The following evidence, which we summarize, corroborates Cross' statements:

- Investigators identified Heck as the victim.

- Heck suffered a single gunshot wound just above the eyebrow.

- Heck's vehicle was found in the Chrysler parking lot and police investigation and video surveillance confirmed this.

- Officers located plastic and glass pieces from a smartphone under Heck's body.

- Officers confirmed that Byars owned a red 1998 Chevrolet Camaro; they confirmed the license plate was registered to the vehicle; and they located this vehicle outside one of the locations where Cross had stated Byars frequently stays.

- Video surveillance showed that Heck's car pulled into the Chrysler parking lot at 2:42 a.m.; a red colored car then pulled up to Heck's car; a

person got out of Heck's car and into the red car; the red car drove away; and Heck's car remained parked in the lot where officers later found it.

- Heck's pants pockets were turned inside out; a powdery substance was found at the scene of the crime; and officers did not locate a cell phone or keys.

[20] Furthermore, Cross provided officers with Byars' cell phone number, and the cell phone records that were obtained established contact between Heck and Byars during the relevant timeframe. Also, Cross and Byars were friends, and Cross knew Byars well enough to know all three vehicles he drove and the three locations he stayed. This certainly adds to her credibility. The probable cause affidavit contained reliable information, and the totality of the circumstances corroborated the hearsay. Accordingly, we conclude the search warrant for Byars' residence was supported by probable cause and the trial court did not abuse its discretion when it admitted the evidence procured via the search warrant.

# Conclusion

[21] Given all the information in the affidavit, we conclude the probable cause affidavit did not contain uncorroborated hearsay, and there was sufficient evidence establishing probable cause to support the warrant authorizing the search of Byars' trailer. Therefore, the trial court did not abuse its discretion when it admitted evidence procured pursuant to the warrant. Accordingly, we affirm.

Affirmed.

Bradford, C.J., and Altice, J., concur.