## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 08 2020, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Susan D. Rayl
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Maurice E. Turentine,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 8, 2020

Court of Appeals Case No.
19A-CR-2816

Appeal from the Marion Superior Court

The Honorable Shelia A. Carlisle, Judge

Trial Court Cause No.
49G03-1705-MR-16584

**Tavitas, Judge.**

# Case Summary

Maurice Turentine appeals his conviction for voluntarily manslaughter, a Level 2 felony. We affirm.

# Issue

Turentine raises one issue for our review, which we revise and restate as whether the trial court abused its discretion in the admission of certain evidence.

# Facts

On April 20, 2017, Sarah Miller ("Sarah") and her husband, Darrell Miller ("Darrell"), went to the home of their friend, James Clark, in Indianapolis. While at Clark's home, Sarah and Darrell used methamphetamine; then, Clark, Sarah, Darrell, and five-year-old J.B., Clark's girlfriend's son, made several stops around the Indianapolis area before returning to Clark's home. Sometime that evening, Sarah, Darrell, and Clark attempted to sell the methamphetamine they had not consumed by "sending everybody . . . text messages." Tr. Vol. III p. 5. Turentine responded to Sarah's messages and indicated he wanted to purchase methamphetamine.

Turentine and Mingo Thames arrived at Clark's home to complete the drug transaction. During the transaction, Turentine and Thames spoke with Clark and Darrell while Sarah watched in the kitchen. After some discussion, Sarah witnessed Turentine give Thames a "let's go" look and saw Thames "reach[ ] into his pants." *Id.* at 18. Darrell shouted Clark's nickname, "Black," several

times. *Id.* Sarah heard a gunshot; Darrell started wrestling Thames for the weapon; and Darrell yelled for Sarah to run away. Sarah ran, grabbed J.B., and hid behind a bedroom door. After Sarah heard several more gunshots, she heard Turentine and Thames leave and discovered that Clark and Darrell were dead. Sarah had to "step over" Clark's body to get to the front door, and Darrell's body was at the bottom of the basement steps "in about two gallons of blood on the floor." *Id.* at 20. A nearby pedestrian heard Sarah calling for help, and law enforcement arrived shortly thereafter.

[5] As he left Clark's home, Turentine phoned Clarice Bailey and told Bailey to call 911 and report that an injured person was outside the home where Turentine's uncle resides. Thames then drove Turentine to the uncle's home. At approximately 10:40 p.m., Bailey called 911 to report that Turentine had been shot, and law enforcement was dispatched to the uncle's home. Officer Romeo Joson, with the Indianapolis Metropolitan Police Department ("IMPD"), arrived to find Turentine lying on the sidewalk outside his uncle's home with multiple gunshot wounds. Turentine told law enforcement that he was the victim of a drive-by shooting.

[6] Clark's autopsy revealed that Clark's cause of death was "[t]wo gunshot wounds of the trunk of the body and right upper extremity." Tr. Vol. II p. 217. Clark's autopsy also revealed methamphetamine and THC in his blood. Darrell's autopsy revealed that Darrell's cause of death was "two gunshot wounds." *Id.* at 234. Darrell's autopsy similarly revealed high amounts of

methamphetamine and THC in his blood. No firearms were found near the bodies of Clark or Darrell.

[7] On May 5, 2017, the State charged Turentine with Count I, the murder of Darrell; and Count II, the murder of Clark.[1] At Turentine's September 2019 jury trial, Tonya Fishburn, with the Indianapolis Marion County Forensic Services Agency, testified that Turentine was a "major contributor" of the DNA from a blood swab collected from the interior front door handle at Clark's residence. Tr. Vol. III p. 244. Turentine's DNA was also recovered from a blood swab on the west wall of Clark's kitchen and a blood swab collected from the top tailgate of Thames' vehicle, which Thames and Turentine used on the night of the shooting.

[8] Turentine testified in his own defense. Turentine testified that he went over to Clark's home, per Sarah's request, to "look at a water leak . . . and hook up some cable." Tr. Vol. IV p. 39. He further testified that Clark and Darrell were the first to point their weapons at Turentine and Thames. During Turentine's testimony, his attorney asked Turentine how long he had been married to his wife, Danielle Turentine ("Danielle"), to which Turentine responded, "[t]welve years." *Id.* at 16. Later in his testimony, Turentine's attorney again asked how long Turentine and his wife had been together.

---

[1] Turentine was initially charged as a co-defendant with Thames; however, on May 18, 2020, the State filed a motion to sever defendants, which the trial court granted on May 30, 2018. Appellant's App. Vol. II p. 104.

[9] After Turentine's direct examination, the trial court recessed for a lunch break prior to giving the State an opportunity to cross-examine Turentine. After the recess, outside of the presence of the jury, the State tendered a certified dissolution of marriage decree between Bailey and Turentine in August 2019.[2] The State argued that, over the lunch break, the State was advised that Turentine married Bailey in April 2017 while he was still married to Danielle. The State informed the trial court that the State intended to cross-examine Turentine regarding his marriage to Bailey because Turentine opened the door when he testified regarding his long marriage to Danielle. Turentine objected. The trial court agreed with the State that Turentine opened the door by testifying "about 12 years of marriage" and that "cross-examination is certainly fair game on that, if there is evidence that proves otherwise." *Id.* at 71.

[10] On cross-examination, the State questioned Turentine about his marriage to Bailey, asking: "[y]ou in fact were married to [Bailey] as well; is that correct?" *Id.* at 76. Turentine admitted that he was also married to Bailey; however, Turentine testified that the marriage was to be annulled. Later, while still cross-examining Turentine, the State raised the issue that Bailey was Turentine's former wife, noting that Turentine did not disclose this fact when he gave a statement to law enforcement in February 2019. On redirect examination, Turentine testified that he had a marriage ceremony with Bailey at the "picnic table across from the City-County building." *Id.* at 93. Turentine further

---

[2] The document was not admitted as an exhibit at trial.

testified that his marriage to Bailey was "vengeful" because he and Danielle were "going through a rough time at the end of 2016, and [ ] had separated for a little while." *Id.* at 94. Finally, according to Turentine, the Marion County Clerk contacted Bailey and disclosed that the marriage was illegitimate.

[11] In closing arguments, the State again referenced Turentine's marriage to Bailey, arguing: "[Turentine] lied, and he lied in more ways than I'm going to be able to talk about with you right now. . . . The latest one is about the marriage. We're not asking you to convict him because he has sordid personal issues. . . ." *Id.* at 129. Turentine did not object to the State's argument. During Turentine's closing arguments, Turentine's attorney acknowledged "the thing with [Bailey] was not good, but it does look desperate on the part of the State." *Id.* at 142. Finally, in rebuttal closing arguments, the State argued: "if you can't be honest about who you are married to, how can you believe anything out of his mouth? You can't." *Id.* at 148. Turentine again did not object to the State's argument.

[12] The jury found Turentine not guilty of Count I, and guilty of voluntary manslaughter, a Level 2 felony, as a lesser included offense of murder, for Count II. Turentine was sentenced to twenty-three years at the Indiana Department of Correction, followed by one year of community corrections. Turentine now appeals his conviction.

# Analysis

[13] Turentine argues the trial court abused its discretion by allowing the State to introduce evidence regarding Turentine's bigamous marriage to Bailey. The State argues that Turentine opened the door to his marriage to Bailey by testifying that he was married to Danielle for twelve years. "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). "We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* at 260.

## A. Whether Turentine Opened the Door to Bad Acts?

[14] We first address whether Turentine opened the door to the admissibility of his marriage to Bailey. On appeal, the State argues that otherwise inadmissible evidence may be admitted when the opposing party opens the door to such evidence. The State argues that "Turentine implied that he had been in a continuous relationship with Danielle for 18 years[.]" Appellee's Br. p. 9. The State, therefore, argues, "[t]he evidence that [Turentine] married Bailey was fair game on cross-examination." *Id.*

[15] Our Supreme Court has held:

> When a party touches upon a subject in direct examination, leaving the trier of fact with a false or misleading impression of the facts related, the direct examiner may be held to have opened the door to the cross examiner to explore the subject fully, even if

the matter so brought out on cross examination would have otherwise been inadmissible.

*Oliver v. State*, 755 N.E.2d 582, 586 (Ind. 2001); *see also Hall v. State,* 36 N.E.3d 459, 472 (Ind. 2015) (noting that "otherwise inadmissible evidence may become admissible if a party opens the door to questioning on that evidence in order to correct a deceptively incomplete disclosure") (quotations omitted). Accordingly, the question before us is whether Turentine's direct examination testimony left the jury with "a false or misleading impression of the facts related." *See Oliver*, 755 N.E.2d at 586.

[16] The State compares the facts here to the facts of *Pearish v. State,* 344 N.E.2d 296 (Ind. 1976). In *Pearish,* the defendant took the stand and testified that he served in the United States Marine Corps. *Pearish,* 344 N.E.2d at 344. On cross-examination, the State asked the defendant whether he had received an honorable discharge when, in fact, the defendant had received a bad conduct discharge. *Id.* Our Supreme Court rejected the defendant's argument that the question constituted improper impeachment, concluding:

> The subject of the Appellant's service in the Marine Corps was brought up during his direct examination. It was proper for the prosecution to question the Appellant about it. We see no abuse of discretion in the trial court's overruling of the defense objection to the question posed.

*Id.* at 345.

[17] We find *Pearish* distinguishable from the facts in this case. Importantly, here, the State was not asking Turentine about his marriage to Danielle—the subject about which Turentine testified. Instead, the State was asking Turentine about his simultaneous marriage to Bailey, which was dissolved prior to the trial. The State asked whether Turentine was married to Bailey "as well." Tr. Vol. IV p. 76. The form of the State's question evidences that it did not seek to clarify the fact of Turentine's marriage to Danielle; rather, the State wanted to present evidence of Turentine's simultaneous marriage to Bailey. Accordingly, the questions by the State here cannot be compared to the question on the same topic in *Pearish.*

[18] Moreover, since *Pearish,* our Supreme Court has made it clear that "the evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Gilliam v. State,* 383 N.E.2d 297, 301 (Ind. 1978). In *Ortiz v. State,* 741 N.E.2d 1203, 1208 (Ind. 2001), Ortiz testified at his trial that he was not a "killer." *Id.* The trial court then allowed the State to cross-examine Ortiz regarding a previous incident which resulted in Ortiz pleading guilty for criminal recklessness. Our Supreme Court held:

> The State first claims that evidence of Ortiz's criminal recklessness conviction is relevant because Ortiz opened the door by stating that he was not a killer. However, his statement is not evidence of a pertinent character trait that a prior conviction for criminal recklessness would rebut. One can be convicted of criminal recklessness and still not be a killer. This is not a case where the defendant says, "I would never beat my wife," and has been convicted of several prior domestic batteries. Evidence of a prior criminal recklessness charge against someone other than the

victim does not rebut a statement that the defendant is not a killer. Further, "the evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Gilliam v. State,* 270 Ind. 71, 77, 383 N.E.2d 297, 301 (1978). Ortiz's one statement about not being a murderer does not create a false impression that he was an upstanding citizen. The trial court thus erred in admitting the evidence under this rationale.

*Id.*

[19] Turentine's testimony that he had been with Danielle for eighteen years and married for twelve of those years did not leave the jury with a "false or misleading impression" regarding Turentine's marriage to Danielle. *See cf. Wilder v. State,* 91 N.E.3d 1016, 1023 (Ind. Ct. App. 2018) (finding that Wilder opened the door to certain statements when "Wilder's attorney's opening remarks and cross-examination of Officer Rusk necessarily left the jury with the false impression that police must interview all witnesses before the State may file criminal charges. The State was entitled at that point to elicit testimony about why it brought charges against Wilder without first interviewing him, his son, or his friend who was in the car with him."). We conclude that Turentine did not open the door to the admissibility of his marriage to Bailey.

### B.  Indiana Rules of Evidence 402, 403, and 404(b)

[20] Because Turentine did not open the door to the admissibility of his marriage to Bailey, we must determine whether the evidence was otherwise admissible. Turentine argues that the evidence was inadmissible under Indiana Rules of Evidence 401 because it was irrelevant; that the evidence was inadmissible as a

prior bad act under Indiana Evidence Rule 404(b); and that, even if the evidence was relevant, it was inadmissible under Indiana Evidence Rule 403 because its probative value was substantially outweighed by a danger of unfair prejudice.

[21] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ind. R. Evid. 401. Indiana Rule of Evidence 402 provides that irrelevant evidence is inadmissible.

[22] We agree with Turentine that evidence of his marriage to Bailey was irrelevant during his murder trial. The fact that Turentine was married to two women at the same time did not make the fact that Turentine committed murder more or less true. The marriage to Bailey was not a fact that was "of consequence in determining the action." Ind. R. Evid. 401(b). Because the evidence was irrelevant, it was inadmissible, and we need not consider whether it complied with the other Rules of Evidence. The trial court abused its discretion in allowing this irrelevant evidence.

[23] This evidence, furthermore, was inadmissible under Indiana Rule of Evidence 404(b).[3] Indiana Code Section 35-46-1-2 provides that: "[a] person who, being married and knowing that the person's spouse is alive, marries again commits

---

[3] Because we decide that the evidence is irrelevant pursuant to Indiana Rules of Evidence 401 and 402 and inadmissible pursuant Indiana Rule of Evidence 404, we do not address Turentine's Indiana Rule of Evidence 403 argument.

bigamy, a Level 6 felony."[4]  The State's accusation of Turentine's marriage to two women, simultaneously, was evidence of a crime and, accordingly, is subject to an analysis under Indiana Rule of Evidence 404(b), which provides:

> (b) Crimes, Wrongs, or Other Acts.
>
> > (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) *Permitted Uses; Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
> >
> > > (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
> > >
> > > (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

[24]    Our Supreme Court summarized the purpose of this rule as follows:

> Indiana Evidence Rule 404(b) serves to safeguard the presumption of innocence in favor of criminal defendants. . . .

---

[4] It does not appear from the record that, as of the time of Turentine's trial, he had ever been charged with bigamy.  At the time of the trial, the marriage to Bailey had been dissolved.

The Rule's mandate is clear: a court may not admit evidence of another crime, wrong, or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evidence Rule 404(b)(1). This restriction prevents the jury from indulging in the forbidden inference that a criminal defendant's prior wrongful conduct suggests present guilt.

*Fairbanks v. State,* 119 N.E.3d 564, 568 (Ind. 2019) (some citations omitted).

[25] The evidence of Turentine's marriage to Bailey does not prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident regarding the incident with Clark and Darrell. Rather, the State evidenced its intent to use Turentine's simultaneous marriages as evidence of Turentine's character in its closing argument that: "if [Turentine] can't be honest about who [he is] married to, how can [the jury] believe anything out of his mouth? You can't." Tr. Vol. IV p. 148. The State clearly used evidence of Turentine's multiple marriages to cast a negative light on Turentine's character. Accordingly, the trial court abused its discretion in admitting this evidence.

### C. Harmless Error

[26] The State argues that, even if the evidence was improperly admitted, any error was harmless. We agree.

> Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. And to determine whether an error in the introduction of evidence affected the appellant's substantial rights, we assess the probable impact of that evidence upon the jury.

*Mendoza-Vargas v. State*, 974 N.E.2d 590, 597 (Ind. Ct. App. 2012).

[27] The State used the evidence during closing arguments to question Turentine's truthfulness. As the State points out in its brief, Turentine also was caught in two other lies during trial. Specifically, Turentine acknowledged in his testimony that he lied to law enforcement about being involved in a drive-by shooting. Additionally, Turentine testified that Sarah contacted him to come to Clark's house to fix a water leak and connect the cable; however, the text messages between Sarah and Turentine reveal otherwise. The jury had substantial other impeachment evidence to cast doubt on Turentine's testimony. *See Scalissi v. State,* 759 N.E.2d 618, 625 (Ind. 2001) (holding that, "[e]ven if the prior theft convictions had not been admitted, the jury would have had substantial impeachment evidence before it to cast doubt on the credibility of Defendant's testimony"). Accordingly, any error in the admission of evidence regarding Turentine's marriage to Bailey was harmless.

## Conclusion

[28] The trial court abused its discretion by admitting evidence regarding Turentine's marriage to Bailey; however, the error was harmless. We affirm.

[29] Affirmed.

Kirsch, J., concurs.

Pyle, J., concurs in result without opinion.