
FILED

Sep 20 2024, 9:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



# IN THE
# Court of Appeals of Indiana

Dongwook Ko,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

September 20, 2024

Court of Appeals Case No.
24A-CR-98

Appeal from the Clay Superior Court

The Honorable Robert A. Pell, Judge

Trial Court Cause No.
11D01-2112-F2-884

**Opinion by Judge Brown**
Judges May and Pyle concur.

**Brown, Judge.**

[1] Dongwook Ko appeals his conviction for conspiracy to commit murder as a level 2 felony. He contends the trial court erred in denying his motion to dismiss pursuant to Ind. Criminal Rule 4, that he was denied a fair trial due to the State's failure to preserve evidence, and that the trial court abused its discretion in admitting certain evidence. We affirm.

**Facts and Procedural History**

[2] In July 2019, Ko was convicted in Monroe County of criminal confinement with a deadly weapon as a level 3 felony. His victim was the thirteen-year-old daughter of Steven Isbitts. In November 2021, Ko was incarcerated in the Clay County Justice Center ("CCJC") and shared a cell with Kelby Stovall. Ko, a native of Korea, was an ICE detainee, and the cell block he was placed in was "kind of a mix of ICE detainees and county/pending [Department of Correction] inmates." Transcript Volume III at 53. Stovall is a member of the Latin Kings gang, and the "jailer [who] brought [Ko] in" asked Stovall to "look out for him" and take Ko under his "wing." *Id*. at 48.

[3] Ko and Stovall would "hangout," "[p]lay cards[,]" "watch T.V." and just "talk." *Id*. at 50. Ko told Stovall that he had a conviction out of Monroe County and that he was being deported. Ko stated that he "wished" the people

involved in his case "could pay." *Id*. at 53. Stovall took that to mean that Ko "wanted something done to them" and he informed Ko that "something . . . most definitely could be done about it." *Id*. Ko made a written list of names, gave it to Stovall, and told Stovall what "he wanted done" to these individuals. *Id*. Ko used acronyms to describe what he wanted done to each person after Stovall warned him that it would be safer to use a "code" in case he got "shook down" by jail personnel: TOS meant terminate on sight; SOS meant smash on sight; and DOS meant disable on sight. *Id*. at 60. Ko gave Stovall descriptions of the people and the areas where they lived. Isbitts was the first name on the list followed by the acronym TOS. Other names on the list included Isbitts's wife, three Monroe County prosecutors, a reporter for the Bloomington Herald Times, a friend of Isbitts's daughter, and two Indiana University professors and friends of Isbitts.

[4] When Stovall "realized [Ko] was pretty serious," he "took it upon [him]self to notify jail officials" and gave them the list. *Id*. at 57. After Stovall told Ko that he had to flush the list down the toilet to avoid it being found, Ko subsequently wrote a second and third list of names and drew a map of Bloomington that he gave to Stovall, and Stovall also gave those items to jail officials. Stovall told Ko that he could pass the lists on to his uncle who could "get things started" and "have surveillance" put on the people listed. *Id*. at 75-76. Stovall "threw out" the amount "twenty-thousand" as what Ko would need to pay to "take care of the situation." *Id*. at 78.

[5]     On November 30, 2021, Stovall, his attorney, a detective, and the prosecutor had a meeting during which they discussed a "plea bargain" for Stovall, and Stovall agreed to wear a wire into the CCJC to talk with Ko and instruct him to call a specific phone number to reach a detective who would be posing as Stovall's uncle.[1] It was Stovall's understanding that the "State and the detectives needed" the "names of who [Ko] wanted taken care of and the amount of money he was willing to pay." *Id.* at 80-81. Accordingly, Stovall came up with the idea that while wearing the wire, he would invite Ko on a "stress walk" which was what inmates called going to "one of the recreation rooms and walk[ing] laps." *Id.* at 82.

[6]     Stovall returned to the cell block from his meeting wearing the wire, told Ko he had some good news about his own case from federal prosecutors, and invited Ko on a stress walk. When they arrived at the recreation room, Stovall told Ko that his case was no longer "going to the FEDS" and he also told Ko that he had spoken with his uncle who told him his son and wife were sick. *Id.* at 84. He then switched subjects and told Ko that, when he talked to his uncle, his uncle had stated that he "wanted to talk to [Ko]" about "operation gold crush," which was the "code name" that they gave for what Ko "wanted done to the people on the list." *Id.* Detectives William Nevill and Johnnie Bohnert watched Stovall and Ko from the live video feed from the jail cameras. Ko told

---

[1] Stovall testified that, in exchange for wearing the wire, the State offered him "six years of home detention." Transcript Volume III at 80.

Stovall that he wanted Isbitts "taken care of first," he reiterated that he meant he wanted the people on the list "take[en]. . .out," that he wanted some "done slow, some of them he wanted fast," and he could pay twenty-thousand dollars in installments which Stovall told him would help cover Stovall's "bond which was twenty-five hundred." *Id*. at 87.

Stovall used a tablet and placed a call to Detective Nevill who was posing as his uncle. Stovall had one headphone earbud in and Ko had the other earbud in so that they both could hear and speak on the call. During the call, Ko again named Isbitts as the person he wanted killed first, gave Detective Neville the name of Isbitts's Bloomington neighborhood, and assured Detective Neville that he was "good on the 20K." *Id*. at 89; State's Exhibit 7. After the call ended, Ko was "real excited" and exclaimed, "I'm a killer." *Id*. at 90; State's Exhibit 7.

Shortly after the call was finished, jail personnel conducted a shake-down search of the cell block members as a way of retrieving the wire and recording device from Stovall. During the shake-down search of Ko, a piece of paper with the number "2500" was retrieved from his pocket. Later that evening, Ko's mother deposited $20 in Stovall's commissary account.

On December 10, 2021, the State charged Ko with conspiracy to commit murder not resulting in death as a level 2 felony. On January 26, 2022, Ko filed a motion to preserve evidence, including all jail video recordings of Stovall and Ko together on dates relevant to the charge. The trial court granted the motion.

The prosecutor informed jail staff of the preservation order, and Jail Commander Brandon Crowley downloaded the video and saved it. However, when he subsequently attempted to locate it and provide it to the defense, he was unable to locate it.

[10] On December 21, 2022, Ko filed a motion to dismiss the charges against him due to the State's "spoilation of critical exculpatory evidence in this case." Appellant's Appendix Volume II at 52. He also filed a motion to dismiss on January 25, 2023, due to alleged violations of Ind. Criminal Rule 4(A). The court denied both motions on February 21, 2023.

[11] A jury trial began on November 1, 2023. The State's witnesses included Stovall, Detective Nevill, Detective Bohnert, former Jail Commander Crowley, and Isbitts. Ko's handwritten lists and the wire recording were among the exhibits offered by the State and admitted into evidence. Ko presented no witnesses. The jury found Ko guilty as charged. The court sentenced him to twenty-four years in the Department of Correction.

## Discussion

### I.

[12] The first issue raised in Ko's appellate brief is that the trial court "erred in denying [his] motion to dismiss based on Indiana Criminal Rule 4 when he had been in custody for over six months with no delays attributable to him." Appellant's Brief at 9. He claims that his "incarceration greatly exceeded the

requirement of Indiana Criminal Rule 4(A)" and that we should therefore "vacate [his] conviction." *Id*. at 10.

[13] At the time of Ko's trial, Ind. Criminal Rule 4(A) provided:

> No defendant shall be detained in jail on a charge, without a trial, for a period in aggregate embracing more than six (6) months from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge (whichever is later); except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar . . . . Any defendant so detained shall be released on his own recognizance at the conclusion of the six-month period aforesaid and may be held to answer a criminal charge against him within the limitations provided for in subsection (C) of this rule.

(Subsequently amended January 1, 2024). It is well established that a defendant held in jail for more than six months is not entitled to discharge from prosecution or dismissal of charges under Ind. Criminal Rule 4(A); rather, the defendant is merely entitled to prompt release on his own recognizance. *Hammann v. State*, 210 N.E.3d 823, 830-831 (Ind. Ct. App. 2023), *reh'g denied, trans. denied*; *see, e.g., S.L. v. Elkhart Superior Ct. No. 3*, 969 N.E.2d 590, 591 (Ind. 2012) (granting "relief in part by ordering that Relator be promptly released on his own recognizance, though he still may be held to answer for the criminal charge against him"); *State ex rel. Bramley v. Tipton Cir. Ct.*, 835 N.E.2d 479, 482 (Ind. 2005) (granting writ requiring relator's release from jail under Ind. Criminal Rule 4(A)).

[14] Thus, even assuming Ko could now demonstrate an Ind. Criminal Rule 4(A) violation, as the only remedy available pursuant to Ind. Criminal Rule 4(A) is release pending trial, and because Ko's trial has already been concluded, we agree with the State that this issue is moot as no effective relief can be granted. *See Mills v. State*, 512 N.E.2d 846, 850 (Ind. 1987) (addressing a defendant's argument that the trial court erred when it denied his motion for discharge under Ind. Criminal Rule 4(A) and holding that the issue was moot as the defendant had been convicted); *Bowens v. State*, 481 N.E.2d 1289, 1290 (Ind. 1985) (holding that appellant's argument under Ind. Criminal Rule 4(A) was moot as, "[i]f [appellant] lost any rights, as he now complains, it was the right to be released on bond because of his incarceration for a period of six months").[2] Accordingly, we need not address this issue further.

## II.

[15] Ko next contends the trial court erred in denying his motion to dismiss based upon the State's alleged failure to "preserve exculpatory evidence which would have shown that [he] was coerced and compelled to take actions that were not voluntary[.]" Appellant's Brief at 10.[3] Specifically, he claims that his due process rights were violated and he was entitled to dismissal because video

---

[2] We note that, in his reply brief, Ko does not again mention this issue or respond to the State's assertion that the issue is moot.

[3] We note that although Ko refers to the spoliation of evidence doctrine and cites to a civil case addressing sanctions such as dismissal for noncompliance with discovery, he cites no authority, and we are unaware of any, applying the civil spoliation doctrine in the criminal context. *See Pigott v. State*, 219 N.E.3d 808, 811 n.3 (Ind. Ct. App. 2023).

evidence "of certain dates in November 2021 and in specific places of the [CCJC] that would have shown [his] innocence" was "negligently or intentionally destroyed" by the State. *Id.*

[16] The trial court's ruling on a defendant's motion to dismiss is reviewed for an abuse of discretion. *State v. Durrett*, 923 N.E.2d 449, 453 (Ind. Ct. App. 2010). An abuse of discretion occurs when denial of the defendant's motion to dismiss is contrary to the facts and circumstances before the trial court. *Id.*

[17] "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 2534 (1984). To determine whether a defendant's due process rights were violated by the State's failure to preserve evidence, we must first determine whether the evidence was "materially exculpatory" or "potentially useful." *Pimentel v. State*, 181 N.E.3d 474, 479-480 (Ind. Ct. App. 2022) (citations omitted), *trans. denied*. Evidence is materially exculpatory if it "possesses an exculpatory value that was apparent before the evidence was destroyed" and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. "While a defendant is not required to prove conclusively that the evidence was exculpatory, there must be some indication in the record that the evidence was exculpatory." *Chissell v. State*, 705 N.E.2d 501, 504 (Ind. Ct. App. 1999), *trans. denied*. Exculpatory evidence is evidence "tending to establish a criminal defendant's innocence." *Durrett*, 923 N.E.2d at 453 (citation omitted). When

the State fails to preserve materially exculpatory evidence, a due process violation occurs regardless of whether the State acted in bad faith. *Terry v. State*, 857 N.E.2d 396, 406 (Ind. Ct. App. 2006), *trans. denied*.

[18] On the other hand, evidence is merely potentially useful if "'no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *Chissell*, 705 N.E.2d at 504 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 337 (1988)). The State's failure to preserve potentially useful evidence does not constitute a denial of due process unless the defendant can show that the State acted in bad faith. *Albrecht v. State*, 737 N.E.2d 719, 724 (Ind. 2000) (citations omitted). To show bad faith, a defendant must show that the State failed to preserve the evidence pursuant to a "a conscious doing of wrong because of dishonest purpose or moral obliquity." *Pimentel*, 181 N.E.3d at 482 (citation omitted).

[19] Ko argues that Stovall was "pursuing" and "grooming" him to make murderous solicitations, and he theorizes that the video evidence "would have shown interactions that occurred between Ko and Stovall" and "would have helped show the demeanor and behavior in these exchanges and add further context." Appellant's Brief at 11. However, Ko has failed to point to any evidence to support his coercion theory or any indication in the record that the video evidence was exculpatory. Indeed, the audio recordings of the interactions that were preserved and admitted into evidence reveal no evidence of coercion. At most, the video evidence was potentially useful evidence.

The record reveals that the prosecutor informed the CCJC of the preservation of evidence order and that Jail Commander Crowley downloaded it and believed that he had saved it. Commander Crowley testified that he transitioned to a new job and later returned to the jail to try to find the video evidence, but he could not find it. He further enlisted others to help him locate the video evidence to no avail. He stated that he did not intentionally destroy the video evidence. As Ko has failed to show bad faith on the part of the State, we cannot say the trial court abused its discretion in denying Ko's motion to dismiss.

## III.

Finally, Ko challenges the trial court's admission of evidence. He argues the trial court abused its discretion in admitting State's Exhibit 7, the wire recording, and in admitting Isbitts's testimony during which he referred to Ko's prior criminal confinement conviction. The State asserts that Ko has waived these arguments for appellate review.

As a general matter, the admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001).

[23] Regarding State's Exhibit 7, Ko's sole assertion on appeal is that the audio recording was inadmissible as "fruit of the poisonous tree" because it was obtained by the State's "misconduct" which he claims "was the intentional or negligent destruction or misplacement of video evidence." Appellant's Brief at 12. However, during trial, Ko made no objection to the admission of State's Exhibit 7 on these grounds and simply indicated to the trial court that, although he had received the wire recording in another format in discovery, he had not seen the "actual physical disk" presented at trial. Transcript Volume III at 94.

[24] It is well established that a party may not object on one ground at trial and raise a different ground on appeal. *White v. State*, 772 N.E.2d 408, 411 (Ind. 2002). This results in waiver of the issue on appeal. *Id*. Moreover, waiver notwithstanding, Ko's fruit of the poisonous tree assertion is misplaced as the wire recording was neither "derivative" of the video recording evidence that was not preserved nor has there been any suggestion or allegation that the wire recording was obtained through illegal or unconstitutional means. *See Clark v. State*, 994 N.E.2d 252, 266 (Ind. 2013) (explaining that fruit of the poisonous tree doctrine applies to "evidence obtained pursuant to an unlawful seizure" and extends to "derivative evidence" that "has been come at by exploitation of that illegality"), (citations omitted). We decline to address Ko's argument further.

[25] As for the trial court's admission of Isbitts's testimony, the record reveals that the State called Isbitts as a witness to provide evidence of Ko's motive. When asked on direct examination, "How are you familiar with the defendant?",

Isbitts responded, "He was convicted of a crime in Monroe County in July 2019." Transcript Volume IV at 8. When asked, "What crime was that?", Isbitts responded, "The crime was felony criminal confinement with a deadly weapon, that was a knife." *Id.* Isbitts further testified that his thirteen-year-old daughter was the victim of Ko's crime, that Ko had pled guilty, that he was involved in the case as "a very interested parent," and that he had attended the sentencing hearing. *Id.* at 9. Ko made no objection to any of this testimony.[4]

[26] We agree with the State that Ko has waived our review of his challenge to the court's admission of Isbitts's testimony. The failure to make a contemporaneous objection to the admission of evidence at trial results in waiver of the error on appeal. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). Ko's failure here results in waiver of appellate review.

[27] For the foregoing reasons, we affirm Ko's conviction.

[28] Affirmed.

May, J., and Pyle, J., concur.

---

[4] The record reveals that Ko only objected after Isbitts made all of the above-mentioned statements and his objection was only to any continued testimony regarding the prior conviction, claiming that continued testimony could violate Ind. Evidence Rule 404(b) and the trial court's ruling on Ko's pretrial motion in limine. Indeed, defense counsel essentially conceded that the above testimony was probative and admissible and that his objection was lodged simply so the State would "move on." Transcript Volume IV at 9.

ATTORNEYS FOR APPELLANT

Preston Grimes
Jonathan D. Harwell
Harwell Gray Legal Counsel, LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana